116 Cal.Rptr.2d 671 (2002)
96 Cal.App.4th 167
Fred MERCURO et al., Petitioners,
v.
The SUPERIOR COURT of Los Angeles County, Respondent;
Countrywide Securities Corporation, Real Party in Interest.
No. B153355.
Court of Appeal, Second District, Division Seven.
February 13, 2002.
Rehearing Denied March 11, 2002.
Review Denied May 15, 2002.
*673 Melanie A. Calvert, Pasadena, for Petitioners.
No appearance for Respondent.
Steptoe & Johnson, Karen A. Rooney and Larry J. Schmadeka, Los Angeles, for Real Party in Interest.
*672 JOHNSON, Acting P.J.
Petitioners Fred and Melissa Mercuro seek a writ of mandate overturning the trial court's order compelling them to arbitrate their employment-related tort claims against Fred Mercuro's former employer, Countrywide Securities Corporation. We issued an alternative writ of mandate. Having considered the parties' further briefing and oral argument, we grant the writ.

FACTS AND PROCEEDINGS BELOW
The material facts are not in dispute.
Fred Mercuro worked in the sales division of Countrywide Securities Corporation from April 1996 to March 2000. After leaving Countrywide, Mercuro filed an action charging it with numerous employment-related torts including age and disability discrimination, fraud, and wrongful termination in violation of public policy. Mercuro's wife joined as a plaintiff in the causes of action for fraudulent inducement and negligent misrepresentation. Countrywide filed a motion to compel the Mercuros to arbitrate all the causes of action in the complaint pursuant to arbitration agreements signed by Fred Mercuro. *674 Melissa Mercuro did not sign either of these agreements.
In order to be employed as a securities broker for Countrywide the Securities and Exchange Commission required Mercuro to apply for a license from the National Association of Securities Dealers (NASD). Accordingly, Mercuro completed and signed the NASD application, commonly known as form U-4. Form U-4 contains a clause in which the applicant agrees to arbitrate covered disputes arising between him and his firm in accordance with the NASD constitution, by-laws and rules. Countrywide never gave Mercuro a copy of the NASD constitution, by-laws or rules nor did anyone at Countrywide advise him the NASD arbitration agreement required him to arbitrate employment disputes including statutory claims of employment discrimination. Furthermore, Mercuro was unaware of any practice in the industry which required arbitration of employment disputes. He believed he was only agreeing to arbitrate disputes arising from his handling of securities and neither understood nor agreed to arbitrate employment disputes with Countrywide.
In March or April 1997, Countrywide asked all its sales personnel to sign a contract agreeing to arbitrate certain disputes which might arise between them and the company. The agreement covered some employment-related claims including employment discrimination but excluded others such as injunctive or other equitable relief for unfair competition, unauthorized disclosure of trade secrets or violation of intellectual property rights. The agreement contained specific provisions in which the employee acknowledged he or she "knowingly and voluntarily" waived his or her right to a jury trial and agreed to certain limitations on his or her ability to conduct discovery. Countrywide offered its employees 25 shares of its stock or an extra vacation day as consideration for signing the agreement.
Mercuro had several discussions about the Countrywide arbitration agreement with Countrywide's upper management including Jonas Roth, Executive Director of Sales, and David Sambol, Chief Executive Officer. Mercuro told Roth and Sambol he was not going to sign the agreement. He explained the extra vacation day was of no value to him and 25 shares of company stock were inadequate consideration for giving up the right to a jury trial should a dispute arise between him and Countrywide.
Roth told Mercuro he "did not have the option of not signing the agreement." According to Roth, Sambol expected every sales person to sign and "if they did not sign the agreement they would find it difficult to make a living at Countrywide." Roth further stated Sambol was already angry at Mercuro and Mercuro's refusal to sign the agreement "would not go well with Sambol;" in fact, it "would put him through the roof."
Several days later, Mercuro had a chance meeting with Sambol and the subject of the arbitration agreement came up. Sambol asked Mercuro why he was the only salesperson who had not signed the agreement. Mercuro responded he did not believe "the arbitration agreement to be in [his] best interest." Sambol told Mercuro that perhaps the explanation was Mercuro "was not generationally compatible with the other salesmen."
Later the same day, Roth told Mercuro that Sandy Samuelson, the corporate attorney "was livid about [Mercuro's] refusal to sign the arbitration agreement" and Sambol was "furious" because Mercuro's refusal to sign made him "look bad." According to Roth, Sambol told him he never should have hired "this S.O.B" and hiring Mercuro "had caused him considerable *675 grief." Sambol also told Roth if Mercuro did not sign the arbitration agreement he would be "cut off and made to "pay big time." Roth said this meant Sambol would remove Mercuro's accounts, refuse to approve his road trips "and take whatever action was necessary to drive [him] out."
Mercuro sought the advice of Dale Ledbetter, Countrywide's Chief Operating Officer. Ledbetter agreed with Mercuro "it was unfair to coerce [his] agreement to arbitrate" but counseled Mercuro to "consider the realities of the situation." Ledbetter confirmed "senior management was, indeed, very angry" about Mercuro's refusal to sign the arbitration agreement. Mercuro testified Ledbetter told him "Sambol and Roth would drive me out, making it all but impossible for me to earn a living, that I would be living in California with no income and litigating a court case which would take years to resolve." In the same conversation, Ledbetter warned Mercuro: "[P]rospective employers would likely discover any lawsuit filed against Countrywide and that I would have difficulty in obtaining other employment." Ledbetter also advised Mercuro: "[I]n reality, the arbitration agreement probably would not hold up in court."
In explaining why he gave in and signed the arbitration agreement, Mercuro stated: "Roth continued to beat on me for several more days, making it clear that I had to sign [the agreement] in order to save my job at Countrywide.... I felt so desperate that I finally signed the agreement...." He asserted he only signed the agreement under "duress and coercion" and did not "voluntarily consent to relinquish my rights to sue Countrywide for employment disputes, including statutory claims."
After a brief hearing, the trial court granted Countrywide's motion to compel arbitration and stayed proceedings in the Mercuros' lawsuit. The court did not address Mercuro's evidence of coercion or his legal arguments on the unconscionability of the agreements. It simply found Mercuro "did in fact know what he was agreeing to." This writ petition followed.

DISCUSSION

I. COUNTRYWIDE'S ARBITRATION AGREEMENT IS UNENFORCEABLE BECAUSE IT IS UNCONSCIONABLE AND PREVENTS MERCURO FROM VINDICATING HIS UNWAIVABLE STATUTORY RIGHTS, AND THE OFFENDING PROVISIONS ARE NOT SEVERABLE.

Where, as here, the extrinsic evidence is undisputed we review the arbitration contract de novo to determine whether it is legally enforceable.[1]
In this case our review is controlled by our Supreme Court's decision in Armendariz v. Foundation Health Psychcare Services, Inc.[2] In Armendariz, the court concluded the arbitration agreement in question was procedurally and substantively unconscionable. In addition, the agreement failed to provide an adequate forum for the vindication of the employees' statutory rights under the Fair Employment and Housing Act (FEHA). We apply the Armendariz analysis here.

A. Countrywide's Arbitration Agreement Is Procedurally And Substantively Unconscionable.

Under California law, the doctrine of unconscionability has a procedural *676 and a substantive element. Both elements must appear in order to invalidate a contract or one of its individual terms.[3] These elements, however, need not be present in the same degree. "[T]he more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa."[4]
Procedural unconscionability turns on adhesivenessa set of circumstances in which the weaker or "adhering" party is presented a contract drafted by the stronger party on a take it or leave it basis.[5] To put it another way, procedural unconscionability focuses on the oppressiveness of the stronger party's conduct.[6]
There can be no doubt in this case Countrywide used oppressive tactics to secure Mercuro's signature on the arbitration agreement. Upper management told Mercuro he "did not have the option of not signing the agreement" if he wanted "to make a living at Countrywide." He was also told if he did not sign the agreement he would be "cut off and made to "pay big time." Countrywide would strip him of his accounts, refuse to approve his travel requests "and take whatever action was necessary to drive [him] out." Even the company official who seemed somewhat sympathetic to Mercuro's position warned him if he did not sign the agreement Countrywide would "drive [him] out" and "[he] would have difficulty in obtaining other employment." In other words, Countrywide would not directly fire Mercuro for refusing to sign the agreement. This would be awkward in view of Countrywide's position the agreement was voluntary. Instead, it would make things so difficult for Mercuro he would be forced to resign and then it would blackball him from the securities industry in order to "make[] it all but impossible for [him] to earn a living."[7]
The economic pressure Countrywide exerted on Mercuro through these threats was particularly acute since Mercuro was 52 years of age at the time, had just moved to California from Florida in the past year, and had only been with Countrywide for approximately a year. He obviously was not in a position to give up his job over an arbitration agreement which might not ever come in to play.
Given Countrywide's highly oppressive conduct in securing Mercuro's consent to its arbitration agreement, he need only make a minimal showing of the agreement's substantive unconscionability.[8]
Mercuro makes two arguments going to the substantive unconscionability, i.e., basic fairness, of the arbitration agreement. The agreement is unfairly one-sided in requiring arbitration of most claims of interest to employees but exempting from arbitration most claims of interest to Countrywide.[9] In addition, the agreement fails to guarantee a neutral arbitrator.[10]
*677 The arbitration agreement specifically covers claims for breach of express or implied contracts or covenants, tort claims, claims of discrimination based on race, sex, age or disability, and claims for violation of any federal, state or other governmental constitution, statute, ordinance, regulation or public policy. Thus the agreement compels arbitration of the claims employees are most likely to bring against Countrywide. On the other hand, the agreement specifically excludes "claims for injunctive and/or other equitable relief for intellectual property violations, unfair competition and/or the use and/or unauthorized disclosure of trade secrets or confidential information...." Thus the agreement exempts from arbitration the claims Countrywide is most likely to bring against its employees.
In Armendariz, the court observed substantive unconscionability may manifest itself if the form of "an agreement requiring arbitration only for the claims of the weaker party but a choice of forums for the claims of the stronger party."[11] This is what we have here: Countrywide requires the weaker partiesits employeesto arbitrate their most common claims while choosing to litigate in the courts its own claims against its employees.
In defense of its arbitration agreement, Countrywide points out the agreement does not require arbitration of every conceivable claim an employee might have. For example, the agreement does not cover claims for workers' compensation, unemployment benefits or benefits under an employee pension plan which has its own arbitration procedure.
These exceptions do not turn what is essentially a unilateral arbitration agreement into a bilateral one. Workers' compensation and unemployment benefits are governed by their own adjudicatory systems; neither is a proper subject matter for arbitration.[12] Claims for pension benefits are only exempt from the arbitration agreement if they are covered by some other arbitration agreement.
Countrywide further argues the agreement is not unconscionable because the exception for intellectual property claims applies to it and its employees. This is not the case. The exception for intellectual property claims only applies if the claim is accompanied by a request for injunctive or other equitable relief. An employee terminated for stealing trade secrets, for example, must arbitrate his wrongful termination claim under the agreement but Countrywide can avoid a corresponding obligation to arbitrate its trade secrets claim against the employee by the simple expedient of requesting injunctive or declaratory relief. As the court stated in Armendariz, an arbitration agreement "lacks basic fairness and mutuality if it requires one contracting party, but not the other, to arbitrate all claims arising out of the same transaction or occurrence or series of transactions or occurrences."[13]
Finally, Countrywide asserts it has a reasonable business justification for not arbitrating claims for injunctive or other equitable relief in cases involving intellectual property violations, unfair competition and unauthorized disclosure of trade secrets or confidential information. Monetary damages for the misappropriation of *678 intellectual property assets are often difficult to calculate, it contends, and would not protect it from further misappropriation of such assets. Therefore, speedy and effective relief from the misappropriation of intellectual property assets can only be had in the court system.
We find this argument unpersuasive for several reasons.
First, it is just argument with no evidence to support it as required under Armendariz.[14]
More importantly, this same argument was made and rejected in Stirlen v. Supercuts, Inc.[15] Supercuts contended it needed immediate access to injunctive relief from the courts in order to protect its intellectual property rights. The Court of Appeal pointed out, however, the emergency judicial relief Supercuts asserted it must have was available to a party compelled to arbitrate a dispute. Code of Civil Procedure section 1281.8, subdivision (b) provides in relevant part: "A party to an arbitration agreement may file [in court] an application for a provisional remedy in connection with an arbitrable controversy, but only upon the ground that the award to which the applicant may be entitled may be rendered ineffectual without provisional relief." "Provisional relief as used in the statute includes preliminary injunctions and temporary restraining orders.[16]
Furthermore, even assuming "business realities" would justify exempting claims for injunctive relief to protect intellectual property rights, the exemption sweeps too broadly because it covers not only claims for injunctive relief but claims for any equitable relief involving intellectual property issues. As the court observed in Stirlen v. Supercuts, Inc., arbitrators in California commonly provide such equitable relief as specific performance, reformation and rescission.[17]
Mercuro also contends the arbitration is fatally flawed because it does not guarantee a neutral arbitrator which, our Supreme Court has held, "is essential to ensuring the integrity of the arbitration process."[18]
Claims under the agreement are to be arbitrated by the National Arbitration Forum (NAF) and the hearings are to be held within the federal judicial district in which the employee was last employed by the company. The record contains a declaration by Countrywide's attorney submitting resumes of the NAF arbitrators in California. By our count, only eight NAF arbitrators have offices in the Central District of California.
Mercuro argues the size of Countrywide, its parent corporation and all its affiliates compared to the relatively few available NAF arbitrators means employees such as he will be victims of the "repeat player effect." The fact an employer repeatedly appears before the same group of arbitrators conveys distinct advantages over the individual employee. These advantages include knowledge of the arbitrators' temperaments, procedural preferences, styles and the like and the *679 arbitrators' cultivation of further business by taking a "split the difference" approach to damages.[19] In Armendariz, the court acknowledged "[v]arious studies show that arbitration is advantageous to employers . . . because it reduces the size of the award that the employee is likely to get, particularly if the employer is a `repeat player' in the arbitration system."[20]
While our Supreme Court has taken notice of the "repeat player effect," the court has never declared this factor renders the arbitration agreement unconscionable per se.[21] The court apparently believes the provisions of Code of Civil Procedure section 1281.6 will keep the proceedings "honest" and neutral.[22] The first sentence in section 1281.6, however, states: "If the arbitration agreement provides a method of appointing an arbitrator, that method shall be followed." The Countrywide agreement provides the arbitrator will be selected by NAF. Therefore the weaker party's participation in the selection of the arbitrator, which is sometimes available under the statute, does not arise under the Countrywide agreement.[23]
We too are not prepared to say without more evidence the "repeat player effect" is enough to render an arbitration agreement unconscionable. However, given the low threshold of substantive unconscionability in this case we find the lack of mutuality as to arbitrable claims together with the disadvantages to the employee in using NAF as the arbitration provider renders the Countrywide arbitration agreement substantively unconscionable.

B. Countrywide's Arbitration Agreement Prevents Mercuro From Vindicating His Unwaivable Statutory Rights.

As a separate and adequate ground for overturning the trial court's order compelling arbitration, we hold the arbitration agreement's provision for sharing the arbitrator's fees prevents Mercuro from having an adequate opportunity to vindicate his unwaivable statutory rights under FEHA and the Labor Code.
In Armendariz, the plaintiffs sued their former employer under FEHA for sexual harassment. The high court held FEHA claims were arbitrable but, because the statutory rights under FEHA were "established for a public reason" and therefore not waivable, arbitration agreements which encompass those rights "must be subject to particular scrutiny."[24] In determining whether arbitration is an adequate forum for securing an employee's rights under *680 FEHA the court held an arbitration agreement must, at a minimum, provide for neutral arbitrators, adequate discovery, a written award subject to limited judicial review, the same types of relief which would be available from a court, and the employees must not be required to bear any type of expense they would not be required to bear if their claims were brought in a court.[25]
In the present case Mercuro alleged causes of action under FEHA for age and disability discrimination. He also alleged causes of action under Labor Code section 970, which prohibits employers from misrepresenting the terms and conditions of employment to induce a person to change residences to take the job, and Labor Code section 230.8, which prohibits an employer from discriminating against its employees for taking time off to participate in their children's school activities.

1. Armendariz is not limited to FEHA claims.

Initially, we see no reason why Armendariz's "particular scrutiny" of arbitration agreements should be confined to claims under FEHA. Rather, under the Supreme Court's analysis, such scrutiny should apply to the enforcement of rights under any statute enacted "for a public reason."[26]
The Legislature enacted Labor Code section 230.8 in part because it found "[p]arents represent the single most important citizen group in terms of school support" and "[t]he building of a network of parent volunteers to support children in public schools is central to the well-being of the entire community."[27] Labor Code section 970 also has a public purpose: to protect the community from the harm inflicted when a fraudulently induced employment ceases and the former employee is left in the community without roots or resources and becomes a charge on the community.[28] We conclude, therefore, the five essentials of an arbitration agreement discussed in Armendariz apply to Mercuro's claims under FEHA and Labor Code sections 230.8 and 970.
In addition to the lack of a neutral arbitrator,[29] Mercuro maintains the Countrywide arbitration agreement prevents him from fully vindicating his statutory causes of action in the arbitration because he is required to pay half the arbitrator's fee and his discovery is unreasonably limited in violation of the rules for arbitrating statutory claims set out in Armendariz.

2. Arbitration fees are unlawfully imposed on Mercuro.

In Armendariz, the court held that at least with respect to arbitration of *681 statutory claims, the employee cannot be required "to bear any type of expense that the employee would not be required to bear if he or she were free to bring the action in court."[30] This means "the employer [must] pay all types of costs that are unique to arbitration," including the arbitrator's fee.[31]
Countrywide concedes the provision in the arbitration contract requiring the employee to pay an equal share of the costs unique to arbitration, including the arbitrator's fee, is unlawful under Armendariz. It maintains, however, it has modified this fee provision to comply with Armendariz[32] and, in any event, the offending provision can be severed from the remainder of the contract.[33]
We find the purported modification fails to cure the defect caused by imposing arbitration fees on the employee.
Countrywide asserts it modified the fee provision of the contract through a letter from its counsel to Mercuro's counsel after Mercuro's lawsuit was filed. The agreement provides, however, it "can be modified or revoked only by a writing signed by the employee and an executive officer of the company ...." Mercuro did not sign the letter and Countrywide does not assert its counsel is an executive officer of the company. Therefore, the purported modification is invalid and the original fee provision remains a part of the contract.[34]
Even if the purported modification is operative, it does not necessarily relieve Mercuro from having to pay for the services of a judge to hear his claims. Countrywide concedes the modification only excuses Mercuro from paying his share of the arbitration costs up front. Mercuro could wind up paying the entire cost of the arbitration, including the arbitrator's fee, should he lose. In this case, the arbitrator's fee alone could easily exceed $10,000.[35] Back-loading this cost to the employee does not solve the problem the Supreme Court was addressing in Armendariz: "the risk that the claimant may have to bear substantial costs" to have his statutory claims adjudicated.[36] Such a system still poses "a significant risk that employees will have to bear large costs to *682 vindicate their statutory right against workplace discrimination, and therefore chills the exercise of that right."[37]
Finally, as we discuss more fully below, severing the unlawful fee provisions from the contract would not solve the problem because the contract is "permeated" by unconscionability and could only be saved, if at all, by a reformation beyond our authority.[38]

3. Mercuro's discovery is not necessarily unfairly limited.

In Armendariz, the Supreme Court acknowledged "adequate discovery is indispensable for the vindication of FEHA claims."[39] Accordingly, the court held, employees "are at least entitled to discovery sufficient to adequately arbitrate their statutory claim, including access to essential documents and witnesses, as determined by the arbitrator(s) and subject to limited judicial review pursuant to Code of Civil Procedure section 1286.2."[40]
The discovery provisions in Countrywide's arbitration agreement state "each side shall be limited to three depositions and an aggregate of 30 discovery requests of any kind, including sub-parts, except as mutually agreed to by the parties."[41] Furthermore, "[a] deposition of a corporate representative shall be limited to no more than four designated subjects." The agreement also provides "[a]ny disputes concerning discovery shall be resolved by the arbitrator, with a presumption against increasing the aggregate limit on requests, additional discovery requests shall be granted only upon a showing of good cause."
Mercuro contends these discovery provisions do not afford him a reasonable opportunity to prove his statutory claims because they are arbitrary, unreasonable and one-sided. It must be conceded Mercuro's concern over the discovery provisions is not totally unreasonable. Nevertheless, without evidence showing how these provisions are applied in practice, we are not prepared to say they would necessarily prevent Mercuro from vindicating his statutory rights.
Mercuro is limited to a total of "30 discovery requests of any kind, including subparts." He is also restricted to three depositions, and these count toward the aggregate 30 discovery request limit. In his petition Mercuro indicates he will need to depose Roth, Ledbetter and Sambol to obtain evidence supporting his age discrimination claim. This will leave Mercuro with just 27 discovery requests (to be divided between interrogatories, including subparts, requests for production of documents and requests for admissions) with which to obtain evidence to support his claims of age discrimination, disability discrimination, misrepresentation under Labor Code section 970 and denial of time off under Labor Code section 230.8 and to refute whatever affirmative defenses Countrywide may raise to these claims. The arbitrator has discretion to increase the aggregate number of discovery requests but only if the employee shows "good cause" and overcomes the "presumption *683 against increasing the aggregate limit of requests."
While the amount of discovery permitted under the arbitration agreement appears inconsistent with the general discovery practice in employment litigation, the limits are applicable to both employer and employee so at least they have the virtue of mutuality. Furthermore, the 30 discovery request limit may work to the employee's advantage by preventing the employer from burying the employee under a mountain of discovery. We also note the discovery limits can be extended by the arbitrator for good cause.
Countrywide has not explained its purpose in adding a specific "presumption against increasing the aggregate limit" of discovery requests to the requirement to show good cause for additional discovery. If this presumption was intended to signal the arbitrator the party seeking additional discovery must show super good cause it might work more to the disadvantage of the employee than the employer. This is because the employer already has in its possession many of the documents relevant to an employment discrimination case as well as having in its employ many of the relevant witnesses.[42] Therefore, compared to the employee, the employer has far less need for discovery in order to prepare for arbitration. Of course, in some cases this imbalance in information may provide the good cause the employee needs in order to exceed the 30 discovery request limit.
Mercuro interprets the arbitration agreement to mean that in deposing Roth, Ledbetter and Sambol he is limited to questioning each deponent on "no more than four designated subjects." This is not necessarily so. The four subject limitation only applies to the depositions of "corporate representatives." This provision may have been intended to parallel Code of Civil Procedure section 2025, subdivision (d)(6) in which the deposition notice is directed to the person in a corporation most knowledgeable on a subject matter "described with reasonable particularity." Admittedly, if Mercuro should wish to inquire into four separate subjects and each subject has its own most knowledgeable person Mercuro would run up against the three deposition limit. This, however, would appear to be the kind of situation in which good cause would exist for allowing additional depositions.
Finally, we note "adequate" discovery does not mean unfettered discovery and Armendariz itself recognizes an arbitration agreement may require "something less than the full panoply of discovery provided in Code of Civil Procedure section 1283.05."[43] Ultimately it is up to the arbitrator and the reviewing court to balance the need for simplicity in arbitration with the discovery needs of the parties.[44]
For the reasons given above, we are unable to say the Countrywide arbitration agreement does not afford adequate discovery rights to employees seeking to vindicate statutory rights as required under Armendariz.

C. The Offending Provisions Of The Arbitration Agreement Cannot Be Severed Or Limited.

When a court finds a contract unconscionable or illegal it has several options. It may refuse to enforce the contract; it may sever the offending clause; *684 or it may limit the application of the offending clause so as to avoid the unconscionable or illegal result.[45] As a general rule, if the central purpose of the contract is "permeated" or "tainted" with unconscionability or illegality then the contract as a whole cannot be enforced. If, on the other hand, the unconscionability or illegality is collateral to the main purpose of the contract, and the offending provisions can be excised from the contract by means of severance or limitation, then the remainder of the contract can be enforced.[46]
In Armendariz, the Supreme Court concluded the arbitration agreement before it could not be enforced because it was "permeated by an unlawful purpose" and could not be saved by merely removing or restricting its unconscionable provisions.[47] The unlawful purpose was not the requirement employees arbitrate their statutory discrimination claims. The court held such claims are arbitrable if certain minimal requirements are met.[48] Rather, the unlawful purpose, as demonstrated by the contract's lack of mutuality, was "to impose arbitration on an employee . . . as an inferior forum that works to the employer's advantage."[49] This lack of mutuality could not be cured by striking or removing the contract's unconscionable provisions but only by augmenting the contract with additional terms which, the court held, it lacked the power to do.[50]
Here, we reach the same conclusion as did the Armendariz court. The Countrywide arbitration agreement is unenforceable because it is permeated with unconscionability and illegality and it cannot be cured by merely extirpating the offending provisionswe would have to rewrite the contract which we lack the power to do.
In this case we find the threats and cajoling by Countrywide management to obtain Mercuro's signature on the arbitration agreement together with the lack of mutuality as to arbitrable claims, the unlawful fee-sharing provision and the disadvantages to the employee in using NAF as the arbitrator "indicate a systematic effort to impose arbitration on an employee . . . as an inferior forum that works to the employer's advantage."[51]
We cannot save the contract by simply hacking off the provisions governing what claims are arbitrable, how fees and costs will be allocated and what organization will conduct the arbitrations. If we did so there would be virtually nothing of substance left to the contract. Instead, we would need to rewrite those provisions according to what we believed was fair and equitable. This, of course, we cannot do.[52]

II. COUNTRYWIDE FAILED TO PRODUCE EVIDENCE SHOWING IT WAS ENTITLED TO COMPEL ARBITRATION UNDER THE NASD RULES.

Countrywide argues even if its own arbitration contract is unenforceable *685 it can compel arbitration of the Mercuros' claims under the terms contained in form U-4, which Mercuro signed when joining Countrywide. This argument fails for several reasons.
The U-4 states in relevant part: "I agree to arbitrate any dispute, claim or controversy that may arise between me and my firm . . . that is required to be arbitrated under the rules, constitutions, or by-laws of the organizations indicated ...." Countrywide contends by signing this agreement Mercuro agreed to arbitrate any employment disputes under the rules of the NASD.
With one important exception noted below, the NASD rules provide for arbitration of any claims "arising out of the employment or termination of employment of associated person(s) with any member."[53] The term "member" means a member of NASD, e.g., a brokerage firm. The term "associated person" means "any natural person engaged in the investment banking or securities business who is directly or indirectly controlling or controlled by such member . . .", e.g., a sales director.[54] Under the NASD rules, arbitration can be compelled only as to claims by "(1) a member against another member; (2) a member against a person associated with a member or a person associated with a member against a member; and (3) a person associated with a member against a person associated with a member."[55]
Countrywide provided no evidence it was a member of NASD either at the time Mercuro executed the U-4 or at the time it sought to compel arbitration of the Mercuros' claims. Therefore, its motion to compel arbitration under the NASD rules must be rejected.[56]
Even if Countrywide could produce evidence of its NASD membership, it would not be entitled to arbitration of Mercuro's statutory discrimination claims. The NASD Code of Arbitration states in rule 10201, subdivision (b): "A claim alleging employment discrimination, including a sexual harassment claim, in violation of a statute is not required to be arbitrated. Such a claim may be arbitrated only if the parties have agreed to arbitrate it, either before or after the dispute arose." Because we have held the Countrywide arbitration agreement is unenforceable, there is no agreement between the parties to arbitrate Mercuro's statutory age and disability discrimination claims.

DISPOSITION
Let a peremptory writ of mandate issue directing the trial court to vacate its August 3, 2001 order compelling arbitration in Los Angeles County Superior Court case number BC247459. Costs are awarded to petitioners.
We concur: WOODS and PERLUSS, JJ.
NOTES
[1] Floras v. Transamerica HomeFirst, Inc. (2001) 93 Cal.App.4th 846, 851, 113 Cal. Rptr.2d 376.
[2] Armendariz v. Foundation Health Psychcare Services, Inc. (2000) 24 Cal.4th 83, 99 Cal. Rptr.2d 745, 6 P.3d 669.
[3] Armendariz, 24 Cal.4th at p. 114, 99 Cal. Rptr.2d 745, 6 P.3d 669.
[4] Armendariz, 24 Cal.4th at p. 114, 99 Cal. Rptr.2d 745, 6 P.3d 669.
[5] Armendariz, 24 Cal.4th at p. 113, 99 Cal. Rptr.2d 745, 6 P.3d 669.
[6] Armendariz, 24 Cal.4th at p. 114, 99 Cal. Rptr.2d 745, 6 P.3d 669.
[7] Countrywide objected to the evidence of these statements on the grounds of lack of foundation, legal conclusion, hearsay and speculation. The trial court did not rule on the objections. We find them to be without merit.
[8] Armendariz, 24 Cal.4th at p. 114, 99 Cal. Rptr.2d 745, 6 P.3d 669.
[9] See Armendariz, 24 Cal.4th at p. 117, 99 Cal.Rptr.2d 745, 6 P.3d 669.
[10] See Armendariz, 24 Cal.4th at p. 103, 99 Cal.Rptr.2d 745, 6 P.3d 669.
[11] Armendariz, 24 Cal.4th at p. 119, 99 Cal. Rptr.2d 745, 6 P.3d 669.
[12] See generally Lab.Code, § 5300 et seq.; Unemp. Ins.Code, § 1951 et seq.
[13] Armendariz, 24 Cal.4th at p. 120, 99 Cal. Rptr.2d 745, 6 P.3d 669.
[14] Armendariz, 24 Cal.4th at p. 117, 99 Cal. Rptr.2d 745, 6 P.3d 669, citing with approval Stirlen v. Supercuts, Inc. (1997) 51 Cal. App.4th 1519, 1536-1537, 60 Cal.Rptr.2d 138.
[15] Stirlen v. Supercuts, Inc., 51 Cal.App.4th at p. 1537, 60 Cal.Rptr.2d 138.
[16] Code Civ. Proc, § 1281.8, subd. (a)(3).
[17] Stirlen v. Supercuts, Inc., 51 Cal.App.4th at p. 1537, fn. 9, 60 Cal.Rptr.2d 138; and see Advanced Micro Devices, Inc. v. Intel Corp. (1994) 9 Cal.4th 362, 373, 36 Cal.Rptr.2d 581, 885 P.2d 994.
[18] Armendariz, 24 Cal.4th at p. 103, 99 Cal. Rptr.2d 745, 6 P.3d 669.
[19] Armendariz, 24 Cal.4th at p. 115, 99 Cal. Rptr.2d 745, 6 P.3d 669; and see Isbell, Compulsory Arbitration of Employment Agreements: Beneficient Shield or Sword of Oppression? Armendariz v. Foundation Health Psychcare Services, Inc. (2001) 22 Whittier L.Rev. 1107, 1142-1144; Bingham, Employment Arbitration: The Repeat Player Effect (1997) 1 Employee Rts. & Employment Poly. J. 189.
[20] Armendariz, 24 Cal.4th at p. 115, 99 Cal. Rptr.2d 745, 6 P.3d 669.
[21] See Engalla v. Permanente Medical Group, Inc. (1997) 15 Cal.4th 951, 985, 64 Cal. Rptr.2d 843, 938 P.2d 903; Armendariz, 24 Cal.4th at p. 115, 99 Cal.Rptr.2d 745, 6 P.3d 669.
[22] Engalla v. Permanente Medical Group, Inc., 15 Cal.4th at pp. 985-986, 64 Cal.Rptr.2d 843, 938 P.2d 903.
[23] Unlike plaintiff in the present case, the employees in Armendariz and the patient in Engalla were permitted to participate in the selection of their arbitrators. (Armendariz, 24 Cal.4th at p. 92, 99 Cal.Rptr.2d 745, 6 P.3d 669; Engalla, 15 Cal.4th at pp. 963-964, 64 Cal.Rptr.2d 843, 938 P.2d 903.)
[24] Armendariz, 24 Cal.4th at p. 100, 99 Cal. Rptr.2d 745, 6 P.3d 669.
[25] Armendariz, 24 Cal.4th at pp. 103-113, 99 Cal.Rptr.2d 745, 6 P.3d 669.
[26] In arriving at its conclusion arbitration of FEHA claims was subject to "particular scrutiny," the Supreme Court in Armendariz relied in part on Civil Code section 3513, which states "a law established for a public reason cannot be contravened by a private agreement." The court also relied on Civil Code section 1668, which provides agreements whose object, directly or indirectly, is to exempt anyone from responsibility for his own wrongdoing "are against the policy of the law." Armendariz, 24 Cal.4th at p. 100, 99 Cal.Rptr.2d 745, 6 P.3d 669. We note the court's opinion itself suggests its minimum requirements for arbitration of statutory claims apply to claims under the Consumer Legal Remedies Act (Civ.Code, § 1750 et seq.). Armendariz, 24 Cal.4th at p. 101, 99 Cal.Rptr.2d 745, 6 P.3d 669.
[27] Stats.1994, ch. 1290, § 2, subdivisions (e), (f).
[28] See Tyco Industries, Inc. v. Superior Court (1985) 164 Cal.App.3d 148, 159, 211 Cal.Rptr. 540.
[29] See discussion above at pp. 678-679.
[30] Armendariz, 24 Cal.4th at pp. 110-111, 99 Cal.Rptr.2d 745, 6 P.3d 669; emphasis in original.
[31] Annendariz, 24 Cal.4th at p. 113, 99 Cal. Rptr.2d 745, 6 P.3d 669.
[32] This purported modification provides Countrywide will pay the costs of arbitration other than $125.00 of the filing fee.
[33] See Swiderski v. Milberg, Weiss, Bershad, Hynes & Lerach (2001) 94 Cal.App.4th 719, 750, 114 Cal.Rptr.2d 513 in which the court stated in dictum a provision in an arbitration agreement requiring the employee to bear an equal share of the arbitrator's fees and administrative costs could be severed to save the agreement's enforceability.
[34] Cf. Stirlen v. Supercuts, Inc., 51 Cal. App.4th at pp. 1535-1536, 60 Cal.Rptr.2d 138 [employer could not unilaterally modify arbitration agreement which, by its terms, was modifiable "only by an agreement in writing signed by the parties"].
[35] NAF's fee for arbitrating a case in the $250,000 to $499,999 range is $2250 for the initial session and $2000 for each additional session. Mercuro's complaint seeks general damages of at least $250,000 for lost wages, commissions and employment benefits. He seeks additional damages for emotional distress plus punitive damages, prejudgment interest and attorney fees.
[36] Annendariz, 24 Cal.4th at p. 110, 99 Cal. Rptr.2d 745, 6 P.3d 669 (emphasis in original) and see California Teachers Assn. v. State of California (1999) 20 Cal.4th 327, 84 Cal. Rptr.2d 425, 975 P.2d 622, holding it was a denial of due process to require a teacher who loses an administrative challenge to her dismissal to pay one-half of the administrative law judge's fees.
[37] Armendariz, 24 Cal.4th at p. 110, 99 Cal. Rptr.2d 745, 6 P.3d 669.
[38] Cf. Armendariz, 24 Cal.4th at pp. 122-125, 99 Cal.Rptr.2d 745, 6 P.3d 669.
[39] Armendariz, 24 Cal.4th at p. 104, 99 Cal. Rptr.2d 745, 6 P.3d 669.
[40] Armendariz, 24 Cal.4th at p. 106, 99 Cal. Rptr.2d 745, 6 P.3d 669, fn. omitted. Code of Civil Procedure section 1286.2 sets out the grounds for vacating an arbitration award.
[41] Discovery of each party's experts is excluded from these limitations.
[42] Armendariz, 24 Cal.4th at p. 104, 99 Cal. Rptr.2d 745, 6 P.3d 669.
[43] Armendariz, 24 Cal.4th at pp. 105-106, 99 Cal.Rptr.2d 745, 6 P.3d 669; emphasis in original.
[44] See Armendariz, 24 Cal.4th at p. 106, fn. 11, 99 Cal.Rptr.2d 745, 6 P.3d 669.
[45] Civ.Code, § 1670.5, subd. (a); Armendariz, 24 Cal.4th at pp. 121-122, 99 Cal.Rptr.2d 745, 6 P.3d 669.
[46] Armendariz, 24 Cal.4th at pp. 122, 124, 99 Cal.Rptr.2d 745, 6 P.3d 669.
[47] Armendariz, 24 Cal.4th at pp. 124-125, 99 Cal.Rptr.2d 745, 6 P.3d 669.
[48] Armendariz, 24 Cal.4th at pp. 90-91, 99 Cal.Rptr.2d 745, 6 P.3d 669.
[49] Armendariz, 24 Cal.4th at p. 124, 99 Cal. Rptr.2d 745, 6 P.3d 669.
[50] Armendariz, 24 Cal.4th at p. 125, 99 Cal. Rptr.2d 745, 6 P.3d 669.
[51] Armendariz, 24 Cal.4th at p. 124, 99 Cal. Rptr.2d 745, 6 P.3d 669.
[52] Armendariz, 24 Cal.4th at p. 125, 99 Cal. Rptr.2d 745, 6 P.3d 669.
[53] NADA Code of Arbitration, rule 10101.
[54] NASD by-laws, Art. 1, subd. (q), quoted in Paul Revere Variable Annuity Ins. v. Kirschhofer (1st Cir.2000) 226 F.3d 15, 19.
[55] NASD Code of Arbitration, rule 10201, subd. (a).
[56] See Paul Revere Variable Annuity Ins. v. Kirschhofer, 226 F.3d at p. 19. Mercuro's spouse, Melissa Mercuro, could not be compelled to arbitrate her claims against Countrywide in any case. Ms. Mercuro is not and never has been a member of NASD or a person associated with a member.