[No. B178160. Second Dist., Div. Seven. Jan. 4, 2006.]

ALAN WAYNE, Plaintiff and Appellant, v.
STAPLES, INC., Defendant and Respondent.

COUNSEL

The Rossbacher Firm, Henry H. Rossbacher, James S. Cahill, Talin Khachaturian; Hagens Berman, Amanda L. Horn and Craig R. Spiegel for Plaintiff and Appellant.

Fulbright & Jaworski, Robert W. Fischer, Jr., and Eric A. Herzog for Defendant and Respondent.

OPINION

**PERLUSS, P. J.**—Alan Wayne appeals from the judgment entered after an order granting summary judgment in favor of Staples, Inc. in this putative class action filed by Wayne alleging that, in selling "declared value coverage" for packages shipped at its retail stores, Staples violated the Consumers Legal Remedies Act, Civil Code section 1750 et seq., by charging an unconscionable price; Business and Professions Code section 17500 et seq. by utilizing a deceptive parcel shipping order form; and Business and Professions Code section 17200 by selling inland marine insurance without a license. Although we affirm the trial court's orders with respect to Wayne's causes of action alleging unconscionable pricing and deceptive marketing, we reverse its ruling that Staples's offer of declared value coverage as part of package shipping transactions is not subject to regulation under the Insurance Code and remand the matter for further proceedings as to the first cause of action for unfair business practices.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *Staples's Package Shipping Business and the Sale of Declared Value Coverage*

The fundamental facts underlying Wayne's complaint are essentially undisputed. Staples, a nationwide retailer of office supplies and services, offers package shipping services to its customers through its agreement to serve as an authorized shipping outlet for United Parcel Service (UPS). Staples expressly disclaims any liability for loss or damage to parcels shipped through its stores. The face page of its parcel shipping order form states, "We assume no liability for the delivery of the parcels accepted for shipment nor for loss or damage by any cause to the parcels or their contents while in transit. In the event of loss or damage to any parcels, we will assist you in filing and processing of claims only."

Staples's shipping customers may protect themselves from the risk of loss or damage to their packages by purchasing insurance through UPS—what

Staples calls "declared value coverage" and what is elsewhere identified as "excess value coverage" or "excess value insurance." UPS charges Staples $0.35 per $100 of declared value over $100 for this coverage; however, prior to May 2002 Staples charged its customers $0.70 per $100 of declared value over $100 for the coverage.[1] Customers are advised of the total cost for the coverage either orally by a Staples sales associate or in writing through a printed receipt given to customers before they pay for the shipping or the coverage. Although Staples notified its customers it may place a surcharge on the coverage, it did not inform them its standard charge for the coverage included a 100 percent markup or margin.

The back page of Staples's parcel shipping order form refers customers to the UPS service guide for a description of the terms and conditions of the insurance coverage: "You may purchase declared value coverage through the carrier designated on this PSO [(parcel shipping order)] or from an independent company, if available. The declared value terms and conditions for the various carriers can be found in the carriers' service guide. The declared value terms and conditions for the various carriers and any applicable independent company selected by you are available for review at this Staples Center. Upon request, you may receive a photocopy of such terms and conditions. Please note that we may surcharge the cost of this product as an administrative expense, for services such as processing of potential claims and other related services."

UPS's excess value coverage or excess value insurance is provided through an inland marine basic policy from the National Union Fire Insurance Company of Pittsburgh, Pa. (National Union). Customers who purchase the coverage at Staples or at other UPS shipping sites are additional insureds under the policy. In general, offering insurance coverage is an activity requiring a license and regulated by the Insurance Code. (See, e.g., Ins. Code, §§ 1631 ["Unless exempt by the provisions of this article, a person shall not solicit, negotiate, or effect contracts of insurance . . . unless the person holds a valid license from the commissioner authorizing the person to act in that capacity."], 1861.05 [requiring approval of insurance rates and prohibiting excessive or inadequate rates].)

---

[1] According to Staples, for competitive reasons it began charging its customers only the amount it actually paid to UPS ($0.35 per $100 of declared value coverage over the first $100) for the coverage in May 2002. Nevertheless, there is no dispute the pre-May 2002 amount Staples charged for declared value coverage was comparable to the amount charged by other retailers of shipping services.

## 2. Wayne's Class Action Complaint; Staples's Answer and Affirmative Defenses

Wayne, a Staples customer who shipped a package from a Staples store after he had purchased declared value coverage, filed a putative class action complaint on behalf of all California residents who had purchased declared value coverage from Staples alleging Staples and its employees solicit and execute contracts for marine inland insurance offered by UPS and keep 50 percent of the premium collected as commission. In his first cause of action Wayne alleged Staples engages in unfair business practices because it is not licensed to sell insurance, charges an excessive insurance premium and does not comply with procedures and regulations established by the Insurance Commissioner for the sale of insurance. In his second cause of action Wayne alleged Staples's retail price for declared value coverage, then twice the regular premium charged by UPS, is excessive and unconscionable in violation of the Consumer Legal Remedies Act. His third cause of action alleged Staples's parcel shipping order form is deceptive because it fails to properly disclose Staples's 100 percent profit or markup on the sale of declared value coverage. The complaint sought compensatory and punitive damages as well as equitable relief.

In its answer, in addition to denying the material allegations of Wayne's unverified complaint, Staples asserted as an affirmative defense that the contracts between Staples and its shipping customers are not contracts of insurance or subject to regulation as insurance contracts because the principal object or purpose of each agreement is to ship packages, not to shift or assume liability as would be the case with a contract of insurance. Staples also asserted as a further affirmative defense that all damages sought by Wayne on behalf of the putative class were avoidable because each Staples customer had the option not to purchase declared value coverage after being advised of the charge as well as to ship their packages, with or without declared value coverage, through a competing shipping service.

## 3. The Motion for Resolution of Key Jury Instructions and Motion In Limine

To permit early determination of legal issues central to the case and with the permission of the court, Staples filed a "motion for resolution of key jury instructions and motion in limine," which addressed whether the jury should be instructed on the Insurance Code with respect to Wayne's first cause of action, whether Staples's charge for declared value coverage is unconscionable and whether its parcel shipping order form is deceptive. After discovery, briefing and argument the court ruled in favor of Staples on each question, concluding Wayne's transactions with Staples were not governed by

the Insurance Code because "the principal object and purpose of the transactions at issue was shipping a package, not shifting the risk of loss"; Staples's charge for declared value coverage was not unconscionable as a matter of law; and Staples's parcel shipping order form was not misleading to its customers.

### 4. *Staples's Motion for Summary Judgment*

Following these rulings Staples filed a motion for summary judgment or in the alternative summary adjudication as to each of the three causes of action asserted by Wayne, reiterating the factual and legal arguments presented in connection with its motion for resolution of key jury instructions and motion in limine. After receipt of opposition and reply papers and oral argument, the trial court granted this motion as well.

As to Wayne's first cause of action alleging unfair business practices, the court held, "Staples is not violating the Insurance Code by offering Declared Value Coverage as part of its package shipping transactions, whether or not Declared Value Coverage constitutes insurance. The undisputed facts indicate that the principal object and purpose of these transactions is the shipment of a package." As to the second cause of action for violation of the Consumers Legal Remedies Act, the court held, "The undisputed facts indicate that Staples's markup on Declared Value Coverage is not unconscionable as a matter of law." As to the third cause of action for untrue and misleading advertising, the court ruled, "The undisputed facts indicate that Staples's parcel shipping order form is not deceptive. Staples's charge for Declared Value Coverage is clearly disclosed at the time of purchase. The full price of Declared Value Coverage is disclosed to the customer before he or she pays for it. The customer can decline to accept the coverage, or decline to ship the package with Staples. Staples's customers are always notified of the charge before they choose to buy the Declared Value Coverage. Furthermore, in connection with the hearing in this case in May 2002, plaintiff argued that the use of the word 'may' by Staples was deceptive because, at that point, Staples always did surcharge the cost of UPS Declared Value Coverage. Staples pointed out that its pricing policy could change. In fact, shortly after that hearing, Staples's pricing policy did change. Staples does not currently surcharge any of UPS' shipping charges. The use of the word 'may' was and is full, proper disclosure."

## DISCUSSION

### 1. *Standard of Review*

We review a grant of summary judgment de novo and decide independently whether the facts not subject to triable dispute warrant judgment for

the moving party as a matter of law. (*Intel Corp. v. Hamidi* (2003) 30 Cal.4th 1342, 1348 [1 Cal.Rptr.3d 32, 71 P.3d 296]; Code Civ. Proc., § 437c, subd. (c).)

2. *The Trial Court Erred in Granting Summary Judgment as to Wayne's Unfair Business Practices Cause of Action on the Ground Staples's Offer of Declared Value Coverage Is Not Subject to Regulation Under the Insurance Code*

a. *Negotiating the sale of insurance, even if not the principal object of a commercial transaction, is subject to regulation under the Insurance Code*

█ The trial court ruled Staples was not violating the Insurance Code by offering shipping customers declared value coverage, a form of inland marine insurance,[2] because the offer and sale of that coverage is only incidental to the principal object of the transaction: the shipment of the customer's package. The principal-object test is an essential analytic tool to evaluate whether certain contracts that contain risk allocation provisions qualify as "insurance." (See, e.g., *Automotive Funding Group, Inc. v. Garamendi* (2003) 114 Cal.App.4th 846, 855–856 [7 Cal.Rptr.3d 912] (*AFG*); *Truta v. Avis Rent A Car System, Inc.* (1987) 193 Cal.App.3d 802, 814 [238 Cal.Rptr. 806] (*Truta*).) Nonetheless, the trial court erred in applying this test to Staples's package shipping services to conclude Staples's offer and sale of inland marine insurance was not subject to regulation by the Insurance Code or the Department of Insurance.[3]

█ Insurance Code section 22 defines insurance as "a contract whereby one undertakes to indemnify another against loss, damage, or liability arising from a contingent or unknown event." Section 22 has been interpreted as requiring two elements: shifting one party's risk of loss to another party and

---

[2] Insurance Code section 103 defines "marine insurance" to include "insurance against any and all kinds of loss of or damage to: [¶¶] (a) . . . all goods, freights, cargoes, merchandise, effects . . . and all other kinds of property, and interests therein, in respect to, appertaining to or in connection with any and all risks or perils of navigation, transit, or transportation, including war risks, on or under any seas or other waters, on land or in the air . . . ."

Marine insurance policies were traditionally indemnity policies that protected against losses resulting from the "perils of the sea." (See *Meyer v. Great Western Ins. Co.* (1894) 104 Cal. 381, 384 [38 P. 82].) Inland marine policies, as the name suggests, covered the risks of inland transportation.

[3] Although Staples argues in its brief on appeal that UPS declared value coverage is not insurance, undisputed fact 2 in its separate statement of undisputed material facts in support of summary judgment states, "When a customer ships a package at a Staples retail store with a declared value in excess of $100, he or she can purchase insurance from UPS that will provide coverage for the value in excess of $100 ('declared value coverage')."

distributing that risk among similarly situated persons. (*AFG, supra,* 114 Cal.App.4th at p. 851; *Truta, supra,* 193 Cal.App.3d at p. 812.) The mere fact a contract involves shifting and distributing risk of loss, however, " 'does not necessarily mean that the agreement constitutes an insurance contract for purposes of statutory regulation.' " (*Title Ins. Co. v. State Bd. of Equalization* (1992) 4 Cal.4th 715, 726 [14 Cal.Rptr.2d 822, 842 P.2d 121]; *Sweatman v. Department of Veterans Affairs* (2001) 25 Cal.4th 62, 74 [104 Cal.Rptr.2d 602, 18 P.3d 29].) Thus, the Court of Appeal in *Truta* held the collision damage waivers offered by car rental companies were not insurance because "[t]he principal object and purpose of the transaction before us, the elements which gives the transaction its distinctive character, is the rental of an automobile. Peripheral to that primary object is an option, available to the lessee, for additional consideration, to reallocate the risk of loss (up to the sum of $1,000) to the lessor in the event the vehicle sustains damage during the rental term. Thus, . . . after reviewing the entire contract we are satisfied that this tangential risk allocation provision should not have the effect of converting the defendants as contracting lessors into insurers subject to statutory regulation." (*Truta,* at p. 814; accord, *AFG,* at pp. 855–856 [debt cancellation program offered by used car lender is not insurance; primary objective of transactions is to finance used car purchases].)

■ The test in *Truta, supra,* 193 Cal.App.3d 802, and *AFG, supra,* 114 Cal.App.4th 846, is whether the principal purpose of the transaction is risk allocation and indemnification or something else. An incidental contract provision that, for a fee, shifts risk of loss from the consumer to the provider of the goods or services does not make the agreement an insurance contract subject to regulation under the Insurance Code. (See, e.g., *Truta,* at p. 811 [the collision damage waiver transaction " 'is not a spreading of risk within insurance concepts, but is rather an allocation of risk by contractual agreement' "].)

Neither *Truta, supra,* 193 Cal.App.3d 802, nor *AFG, supra,* 114 Cal.App.4th 846, holds, however, that the sale of insurance coverage as an incidental part of a more extensive transaction is not subject to regulation under the Insurance Code. (See, e.g., *Grand Rent A Car Corp. v. 20th Century Ins. Co.* (1994) 25 Cal.App.4th 1242, 1251–1252 [31 Cal.Rptr.2d 88] [car rental agreement that contains provision indemnifying renter from liability to third persons resulting from accidents occurring while the rented car is in use constitutes insurance even when the liability insurance/car rental agreement is effectuated by a certificate of self-insurance]; *Hertz Corp. v. Home Ins. Co.* (1993) 14 Cal.App.4th 1071, 1077 & fn. 5 [18 Cal.Rptr.2d 267] [same, distinguishing *Truta*].) In other words, while it is true not all contracts allocating risk are insurance contracts subject to statutory regulation, all insurance contracts, even if sold as a secondary or incidental facet of a transaction with another, primary commercial purpose, are regulated by the

Insurance Code and the Department of Insurance unless they fall within a specific regulatory exemption. Followed to its logical extreme, the contrary rule, as adopted by the trial court in this case, would permit a car dealership to obtain commissions for the sale of automobile insurance or a real estate broker to sell homeowners insurance without being subject to regulation by the Insurance Code or the Insurance Commissioner because in each instance the sale of insurance was incidental to the purchase of a car or a house.

■ Use of the principal-object-and-purpose test to exempt a contract of inland marine insurance from statutory regulation is particularly inappropriate because this class of coverage, expressly regulated by the Insurance Code (see Ins. Code, §§ 100, subd. (3), 103), is intended to protect against loss or damage to goods in transit or while being prepared for or awaiting shipment. As a result, this insurance coverage will most often be offered, as it was in this case, in connection with, and incidental to, the customer's primary purpose of shipping his or her goods. Indeed, this distinctive aspect of inland marine insurance has been recognized in section 1635 of the Insurance Code, which exempts shippers such as UPS and Staples from insurance licensing requirements if they complete or deliver a certificate of coverage under an inland marine insurance contract to their customers without being paid or receiving a commission: "No license is required under the provisions of this chapter for a person to act in the following capacities or to engage in the following activities, providing no commission is paid or allowed, directly or indirectly, by the insurer, creditor, retailer, or other person for acting in those capacities or engaging in those activities: [¶] . . . [¶] (h) The completion or delivery of a declaration or certificate of coverage under a running inland marine insurance contract evidencing coverage thereunder and including only those negotiations as are necessary to the completion or delivery if the person performing those acts or his or her employer has an insurable interest in the risk covered by the certificate or declaration." (Ins. Code, § 1635, subd. (h).)[4]

> b. *Staples's profit on the sale of declared value coverage constitutes a "commission" within the meaning of the Insurance Code*

The determinative question as to the viability of Wayne's first cause of action, therefore, is not whether a Staples's customer's principal purpose is shipping his or her package, rather than obtaining insurance against loss or

---

[4] It is difficult to imagine why someone would negotiate the sale of insurance for no commission or fee unless the provision of such coverage was incidental to some other, profit-generating activity—such as shipping customers' packages. If the principal-object-and-purpose test excluded from regulation any sale of inland marine insurance incidental to providing shipping services, however, the no-commission exemption would in effect be superfluous.

damage to that package during transit, but whether Staples's 100 percent markup on the cost of the insurance provided through UPS constitutes a commission, as Wayne argues, or is simply "profit," as Staples asserts, that does not preclude Staples from enjoying the exemption from insurance licensing requirements contained in Insurance Code section 1635, subdivision (h).

■ Labor Code section 204.1, which specifically addresses the time for payment of commission wages to employees of car dealerships, defines the term "commission wages" as "compensation paid to any person for services rendered in the sale of such employer's property or services and based proportionately upon the amount or value thereof." Interpreting that provision in *Keyes Motors, Inc. v. Division of Labor Standards Enforcement* (1987) 197 Cal.App.3d 557, 563 [242 Cal.Rptr. 873], this court identified two essential requirements for a compensation scheme to be deemed "commission wages": (1) the employee must be involved principally in selling a product or service, rather than making or providing the product or service; and (2) the amount of payment must be a percent of the price of the product or service. Although this definition is part of a narrowly focused Labor Code provision, the Supreme Court has held "the statute's definition of 'commission' is more generally applicable" and specifically approved the two-element test we articulated in *Keyes Motors*. (*Ramirez v. Yosemite Water Co.* (1999) 20 Cal.4th 785, 803–804 [85 Cal.Rptr.2d 844, 978 P.2d 2].)

With respect to the UPS declared or excess value insurance provided to shipping customers at Staples retail stores, there can be no serious dispute Staples is involved principally in selling the product and it calculated its margin or profit as a percentage of the price of the insurance product charged by UPS. Staples argues, however, that the same is essentially true for all items it sells in its stores: It is in the business of selling goods, and it generates profits by marking up the wholesale price to sell at retail. According to Staples, the fact it makes a profit on selling the coverage, as it hopes to do on everything in its stores, does not make that profit a "commission." Rather, in this context a commission means only a fee paid by UPS (or National Union) to Staples or a fee paid by Staples to its employees each time declared or excess value coverage is sold.

■ Staples's argument, although superficially appealing, fails to give sufficient weight to the actual language used in Insurance Code section 1635 to strictly limit the availability of the exemption set forth in subdivision (h) to instances in which "no commission is paid or allowed, directly or indirectly, by the insurer . . . ." ■ The Legislature's decision to exclude transactions in which "indirect" commissions have merely been "allowed" by the insurer plainly indicates an intent to preclude use of this exemption by anyone who

receives from any source a fee, based on the amount of premium paid, for negotiating the sale of insurance. (See *Graham v. DaimlerChrysler Corp.* (2004) 34 Cal.4th 553, 571 [21 Cal.Rptr.3d 331, 101 P.3d 140] [courts look to the " 'usual and ordinary meaning' of the statutory language in order to discern legislative intent"]; *Murillo v. Fleetwood Enterprises, Inc.* (1998) 17 Cal.4th 985, 990 [73 Cal.Rptr.2d 682, 953 P.2d 858] [in resolving questions of statutory interpretation, the court "must attempt to effectuate the probable intent of the Legislature, as expressed through the actual words of the statutes in question"; the first step " ' "is to scrutinize the actual words of the statute, giving them a plain and commonsense meaning. [Citations.]" [Citation.]' "].)

Moreover, unlike the office products it purchases at wholesale and then resells in its stores, Staples does not "own" the insurance it makes available to its customers. Rather, it serves as an agent for their acquisition of the direct or excess value insurance offered by UPS, bringing supplier and customer together.[5] Although, as Staples notes, UPS does not pay Staples for its role in the transaction, at the very least UPS allows Staples indirectly to impose an additional percentage service fee as part of the gross premium charged to the shipper-insured. As such, the amount collected by Staples in excess of the $0.35 charged by UPS for the coverage is "commission" within the meaning of Insurance Code section 1635.

■ In sum, the declared value coverage offered by Staples to its shipping customers is, without question, insurance; and the fact it is offered only as an incidental aspect of a transaction focused on shipping packages does not exempt Staples from insurance licensing requirements. ■ Although Staples's current marketing practices (charging its customers only what it is actually charged by UPS for excess value insurance) may well fall within the exemption provided by Insurance Code section 1635, subdivision (h), the transactions challenged by Wayne's lawsuit do not qualify for that exemption. Accordingly, it was error to grant summary judgment with respect to Wayne's cause of action asserting Staples's violations of the Insurance Code constitute unfair business practices. (See *Stevens v. Superior Court* (1999) 75 Cal.App.4th 594, 598 [89 Cal.Rptr.2d 370] [private plaintiff may bring action under Bus. & Prof. Code, § 17200 for violations of licensing provisions of the Insurance Code].)

---

[5] The noun "commission" is derived from a Latin root (by way of Middle French and Middle English) meaning "act of bringing together" and is commonly defined, in part, as "a fee paid to an agent or employee for transacting a piece of business or performing a service; *esp*: a percentage of the money received from a total paid to the agent responsible for the business." (Webster's 10th New Collegiate Dict. (1995) p. 231.)

3. *Summary Adjudication Was Properly Granted as to Wayne's Cause of Action for Unconscionable Pricing of the Declared Value Coverage*

Unconscionability is a question of law for the court. (Civ. Code, § 1670.5; *Gutierrez v. Autowest, Inc.* (2003) 114 Cal.App.4th 77, 89 [7 Cal.Rptr.3d 267]; *Marin Storage & Trucking, Inc. v. Benco Contracting & Engineering, Inc.* (2001) 89 Cal.App.4th 1042, 1055 [107 Cal.Rptr.2d 645].) Nonetheless, factual issues may bear on that question. (Civ. Code, § 1670.5, subd. (b) [when it appears a contract provision may be unconscionable, "the parties shall be afforded a reasonable opportunity to present evidence as to its commercial setting, purpose, and effect to aid the court in making the determination"]; *Gutierrez*, at p. 89.)

Unconscionability has both procedural and substantive elements. (*Armendariz v. Foundation Health Psychcare Services, Inc.* (2000) 24 Cal.4th 83, 99 [99 Cal.Rptr.2d 745, 6 P.3d 669] (*Armendariz*); *Jones v. Wells Fargo Bank* (2003) 112 Cal.App.4th 1527, 1539 [5 Cal.Rptr.3d 835].) Both must appear for a court to invalidate a contract or one of its individual terms (*Armendariz*, at p. 114; *Mercuro v. Superior Court* (2002) 96 Cal.App.4th 167, 174 [116 Cal.Rptr.2d 671] (*Mercuro*)), but need not be present in the same degree: "[T]he more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa." (*Armendariz*, at p. 114.)

Procedural unconscionability focuses on the elements of oppression and surprise. (*Discover Bank v. Superior Court* (2005) 36 Cal.4th 148, 160 [30 Cal.Rptr.3d 76, 113 P.3d 1100].) " ' "Oppression arises from an inequality of bargaining power which results in no real negotiation and an absence of meaningful choice . . . . Surprise involves the extent to which the terms of the bargain are hidden in a 'prolix printed form' drafted by a party in a superior bargaining position." ' " (*Crippen v. Central Valley RV Outlet* (2004) 124 Cal.App.4th 1159, 1165 [22 Cal.Rptr.3d 189]; *Mercuro, supra*, 96 Cal.App.4th at p. 174 ["procedural unconscionability focuses on the oppressiveness of the stronger party's conduct"].)

Substantive unconscionability focuses on the actual terms of the agreement and evaluates whether they create " ' "overly harsh" ' " or " ' "one-sided" ' results" (*Armendariz, supra*, 24 Cal.4th at p. 114), that is, whether contractual provisions reallocate risks in an objectively unreasonable or unexpected manner. (*Jones v. Wells Fargo Bank, supra*, 112 Cal.App.4th at p. 1539.) To be substantively unconscionable, a contractual provision must shock the conscience. (*California Grocers Assn. v. Bank of America* (1994) 22 Cal.App.4th 205, 214 [27 Cal.Rptr.2d 396]; *Kinney v. United HealthCare*

*Services, Inc.* (1999) 70 Cal.App.4th 1322, 1330 [83 Cal.Rptr.2d 348] [" 'Substantive unconscionability' focuses on the terms of the agreement and whether those terms are 'so one-sided as to *"shock the conscience."* ' [Citations.]"].)

██ The parties' agreement as to price, like any other contract provision, may be found unconscionable. (*Perdue v. Crocker National Bank* (1985) 38 Cal.3d 913, 926–927 [216 Cal.Rptr. 345, 702 P.2d 503].) "[I]t is clear that the price term, like any other term in a contract, may be unconscionable. [Citations.] Allegations that the price exceeds cost or fair value, standing alone, do not state a cause of action. [Citations.] Instead, plaintiff's case will turn upon further allegations and proof setting forth the circumstances of the transaction. [¶] The courts look to the basis and justification for the price [citation], including 'the price actually being paid by . . . other similarly situated consumers in a similar transaction.' [Citation.] . . . While it is unlikely that a court would find a price set by a freely competitive market to be unconscionable [citation], the market price set by an oligopoly should not be immune from scrutiny. Thus courts consider not only the market price, but also the cost of the goods or services to the seller [citations], the inconvenience imposed on the seller [citation], and the true value of the product or service [citation]." (*Ibid.*)

Wayne's theory of price unconscionability is grounded in a 1999 United States Tax Court opinion dealing with the proper tax reporting consequences of UPS's sale of declared value coverage. In that opinion, subsequently reversed on appeal, the tax court expressed the view UPS's charge of $0.35 per $100 of declared value over $100 was significantly in excess of the actual cost for such insurance on the open market. (*United Parcel Service of America, Inc.* (1999) [78 T.C.M. (CCH) 262, revd. (11th Cir. 2001) 254 F.3d 1014, 1017–1018.) Extrapolating from that observation, Wayne argues the fee imposed by Staples for UPS's declared value coverage, which was twice that charged by UPS itself, was necessarily far in excess of a price that would be determined in a competitive business environment—and therefore unconscionable—because UPS bears all the losses and claims adjustment expenses and Staples does not assume any risk in the transaction.

### a. *Procedural unconscionability*

Wayne's assertion of unconscionability suffers from several fatal flaws. First, Staples clearly discloses the price of the declared value coverage, thus negating any contention of procedural unconscionability based on "surprise." (See *Gutierrez v. Autowest, Inc., supra,* 114 Cal.App.4th at p. 87. [" 'Surprise' is defined as 'the extent to which the supposedly agreed-upon terms of

the bargain are hidden in the prolix printed form drafted by the party seeking to enforce the disputed terms.' "].) Indeed, Wayne does not attempt to demonstrate the price for disclosed value coverage was hidden from him (although he does claim, as discussed below, that Staples's disclosure is deceptive because it fails to fully advise the shipping customer of Staples's profit margin on the coverage).

Second, Staples gives its customers the option to ship packages without purchasing the coverage, as well as to obtain excess value coverage from other carriers. In addition, potential customers have a wide range of choices other than shipping their packages at Staples, from dealing directly with UPS, Federal Express or the United States Postal Service to patronizing other retail shipping outlets such as Mail Boxes, Etc. or Postal Annex. There can be no oppression establishing procedural unconscionability, even assuming unequal bargaining power and an adhesion contract, when the customer has meaningful choices: "[A]ny claim of 'oppression' may be defeated if the complaining party has reasonably available alternative sources of supply from which to obtain the desired goods or services free of the terms claimed to be unconscionable." (*Dean Witter Reynolds, Inc. v. Superior Court* (1989) 211 Cal.App.3d 758, 768 [259 Cal.Rptr. 789]; see *Marin Storage & Trucking, Inc. v. Benco Contracting & Engineering, Inc., supra,* 89 Cal.App.4th at p. 1056 [alternative sources rendered procedural unfairness of adhesive contract minimal].) Thus, even assuming some imbalance in the bargaining power between Staples and its shipping customers, neither coercion nor lack of choice, the usual hallmarks of procedural unconscionability, was present in the challenged shipping transactions. (See *Woodside Homes of Cal., Inc. v. Superior Court* (2003) 107 Cal.App.4th 723, 730 [132 Cal.Rptr.2d 35] [absence of evidence of de facto coercion or lack of choices by buyers supports conclusion there was at most minimal procedural unconscionability].)

b. *Substantive unconscionability*

In the absence of any evidence of procedural unconscionability in connection with Staples's offer and sale of declared value coverage, the mere allegation the price charged for the coverage exceeds cost or fair value is not sufficient to establish substantive unconscionability. (*Perdue v. Crocker National Bank, supra,* 38 Cal.3d at p. 926; *Vance v. Villa Park Mobilehome Estates* (1995) 36 Cal.App.4th 698, 710 [42 Cal.Rptr.2d 723].) Wayne does not allege any facts, let alone present evidence, suggesting the market for package shipping services is an oligopoly.[6] (Cf. *Perdue,* at p. 927 [price

---

[6] "An oligopoly is 'a market structure in which a few sellers dominate the sales of a product and where entry of new sellers is difficult or impossible. . . . [¶] Oligopolistic markets are characterized by high market concentration. Usually the four largest producers of a good

within the range of general market prices may still be held unconscionable if the market is oligopolistic].) To the contrary, in his opposition to Staples's motion for summary judgment, Wayne conceded not only that Staples's charge for declared value coverage was comparable to the amount charged by other retailers of shipping services, but also that consumers have multiple options available for shipping a package. (*Ibid.* ["it is unlikely that a court would find a price set by a freely competitive market to be unconscionable"]; see *Morris v. Redwood Empire Bancorp, supra,* 128 Cal.App.4th at pp. 1323–1324.) In addition, case law supports the general proposition advanced by Staples that a 100 percent markup or profit margin "is wholly within the range of commonly accepted notions of fair profitability. Cases of price unconscionability generally involve much greater price-value disparities. [Citations.]" (*California Grocers Assn. v. Bank of America, supra,* 22 Cal.App.4th at p. 216 [holding bank's assessment of $3 fee for deposited items returned was not unconscionable even assuming administrative costs were only $1.50, resulting in 100 percent markup or profit].)

 "The phrases 'harsh,' 'oppressive,' and 'shock the conscience' are not synonymous with 'unreasonable.' Basing an unconscionability determination on the reasonableness of a contract provision would inject an inappropriate level of judicial subjectivity into the analysis 'With a concept as nebulous as "unconscionability" it is important that courts not be thrust in the paternalistic role of intervening to change contractual terms that the parties have agreed to merely because the court believes the terms are unreasonable. The terms must shock the conscience.' [Citations.]" (*Morris v. Redwood Empire Bancorp, supra,* 128 Cal.App.4th at pp. 1322–1323.) Staples's pre-May 2002 charge of $0.70 per $100 of declared value over $100—a 100 percent markup on coverage for which UPS charged only $0.35 per $100—does not shock the conscience as a matter of law.

4. *Summary Adjudication Was Properly Granted as to Wayne's Cause of Action for Deceptive Marketing of the Declared Value Coverage*

Staples's parcel shipping order form advises its customers that the declared value coverage being offered will actually be provided through the carrier (that is, UPS), not Staples. The form further states, "Please note that we may surcharge the cost of this product as an administrative expense, for services such as processing of potential claims and related services." Wayne argues (and Staples does not dispute) that until May 2002 Staples automatically "surcharged" the cost of the coverage provided by UPS without regard to actual administrative expense, and Wayne contended in his third cause of

account for over half the domestic shipments.' [Citation.]" (*California Grocers Assn. v. Bank of America, supra,* 22 Cal.App.4th at p. 216; *Morris v. Redwood Empire Bancorp* (2005) 128 Cal.App.4th 1305, 1323, fn. 8 [27 Cal.Rptr.3d 797].)

action the 100 percent markup was a concealed commission misrepresented to Staples's customers as an optional service fee and as such constituted misleading or deceptive advertising in violation of Business and Professions Code section 17500 et seq.

 To state a cause of action under consumer protection statutes designed to protect the public from misleading or deceptive advertising, the plaintiff must demonstrate that " 'members of the public are likely to be deceived.' [Citations.]" (*Committee on Children's Television, Inc. v. General Foods Corp.* (1983) 35 Cal.3d 197, 211 [197 Cal.Rptr. 783, 673 P.2d 660]; *Day v. AT & T Corp.* (1998) 63 Cal.App.4th 325, 331–332 [74 Cal.Rptr.2d 55].) In light of Staples's clear disclosure of the actual price it would charge its customers for declared value coverage prior to any purchase, the trial court properly concluded any ambiguity in the order form as to whether the amount charged includes a "surcharge" or profit for Staples was not misleading or deceptive. (See *Searle v. Wyndham Internat., Inc.* (2002) 102 Cal.App.4th 1327, 1334–1335 [126 Cal.Rptr.2d 231] [failure to disclose whether clearly stated 17 percent service charge on hotel room service was remitted to hotel employees not unfair or deceptive]; *Plotkin v. Sajahtera, Inc.* (2003) 106 Cal.App.4th 953, 965–966 [131 Cal.Rptr.2d 303] [unambiguous notice of valet parking charges on parking ticket given to customer sufficient to defeat claims for deceptive business practices as a matter of law notwithstanding failure of parking operators to notify customers of charges in advance; "the public was not likely to be deceived"]; see also *Walker v. Countrywide Home Loans, Inc.* (2002) 98 Cal.App.4th 1158, 1176–1177 [121 Cal.Rptr.2d 79] [use of word "may" in deed of trust authorized lender to charge inspection fees even though specific fees not disclosed in advance].)

## DISPOSITION

The judgment is reversed. On remand the trial court shall enter an order denying Staples's motion for summary judgment and its alternative motion for summary adjudication as to Wayne's first cause of action and granting the alternative motion as to Wayne's second and third causes of action and shall conduct further proceedings not inconsistent with this opinion. Wayne is to recover his costs on appeal.

Johnson, J., concurred.

**WOODS, J.,** Concurring and Dissenting.—I concur in the majority's affirmance of the trial court's rulings in favor of Staples, Inc. with respect to Wayne's second cause of action, alleging the pricing of Staples's "declared value coverage" is unconscionable and violates the Consumers Legal Remedies Act, Civil Code section 1750 et seq., and his third cause of action,

alleging Staples's order form for its declared value coverage is deceptive and violates Business and Professions Code section 17500 et seq. for the reasons given by the majority. However, I respectfully disagree with the majority's conclusion that Wayne's first cause of action in his putative class action complaint, alleging Staples engaged in the sale of inland marine insurance without a license is an unlawful business practice in violation of Business and Professions Code section 17200. I concede that a private plaintiff may bring an action under section 17200 for violations of licensing provisions of the Insurance Code as held in *Stevens v. Superior Court* (1999) 75 Cal.App.4th 594 [89 Cal.Rptr.3d 370], but I find no reason to sidestep the well established "principal-object-and-purpose test" in determining whether Staples was engaged in the sale of insurance.

Staples's core contention on appeal centers around its assertion that California follows the "principal object and purpose" test in determining whether a transaction falls under the California Insurance Code and the regulations applicable thereto. Staples maintains that while all insurance contracts allocate risk for mishaps, not all contracts allocating risk are governed by laws regulating insurance. Staples cites the decision of our high court in *Title Ins. Co. v. State Bd. of Equalization* (1992) 4 Cal.4th 715, 726, 727 [14 Cal.Rptr.2d 822, 842 P.2d 121], for its contention that only those contracts that are primarily for the purpose of allocating risk are characterized as insurance contracts, subject to stringent insurance regulations. I find the instruction given by our high court in *Title Ins. Co.* pertaining to the principal object and purpose test to be clear and unambiguous. Our high court states at pages 726 and 727 as follows:

"The underwriting agreement does not appear to be a contract of insurance for two reasons. First, it does not appear to distribute the risk of liability for claims among similarly situated persons. Under the contract, the underwritten title company agrees to indemnify the insurer for a portion of its liability. There is no indication that the underwriting agreements distribute the risk among similarly situated title insurers.

"Second, 'the mere fact that a contract contains these two elements [shifting and distribution of risk of loss] does not necessarily mean that the agreement constitutes an insurance contract for purposes of statutory regulation.' (*Truta v. Avis Rent a Car System, Inc.* (1987) 193 Cal.App.3d 802, 812 [238 Cal.Rptr. 806] [*Truta*].) Rather than simply look to whether the contract involves an assumption of a risk, we will instead ask ' "whether that [assumption of risk] or something else to which it is related in the particular plan is its principal object and purpose." ' (*Transportation Guar. Co. v. Jellins* (1946) 29 Cal.2d 242, 249 [174 P.2d 625] [*Jellins*]; see also 12 Appleman, Insurance Law and Practice (1981) § 7002, p. 14.)

"Following this reasoning, California courts have held that arrangements similar to those in this case were not illegal contracts of insurance. For instance, a car rental agreement containing an element of insurance was not an illegal contract of insurance because the insurance element was peripheral to the main purpose of the contract. (*Truta, supra,* 193 Cal.App.3d at p. 814.) Likewise, a truck maintenance contract in which the contractor agreed to insure the vehicles for the owner with an authorized insurance company was held to be not an illegal contract because the main purpose of the contract was to supply labor. (*Jellins, supra,* 29 Cal.2d at pp. 249, 252–253.) Further, a medical services corporation that provided medical services to low-income patients who paid monthly membership dues did not engage in the business of insurance illegally, because the principal purpose or object of the operation was service rather than indemnity. (*California Physicians' Service v. Garrison* (1946) 28 Cal.2d 790, 809–810 [172 P.2d 4].)

"Based on this analysis, we conclude that the underwriting agreements are not illegal contracts of insurance. Their main function is not to require the underwritten title company to provide insurance, either to the title insurer or to the insured, but instead to require the underwritten title company to perform a title search and examination carefully and diligently as well as to carry out the formalities involved in the issuance of a title insurance policy. The indemnification provisions are secondary to the main object and purpose of the underwriting agreements. In fact, the agreements to indemnify appear to be designed, at least in part, to give the underwritten title companies an incentive to perform their title search in a nonnegligent manner, as the title companies are in the best position to eliminate possible risk. Therefore, the title company is not involved in the illegal practice of insurance even if an underwritten title company is deemed to have provided indemnification in connection with the main purpose of its contract with the title insurer." (*Title Ins. Co. v. State Bd. of Equalization, supra,* 4 Cal.4th at pp. 726–727.)

Staples places further reliance on a recent decision from Division 8 of this court holding that a contract with risk-shifting principles is not subject to California insurance regulations if the principal object of the contract is something other than insurance. In *Automotive Funding Group, Inc. v. Garamendi* (2003) 114 Cal.App.4th 846 [7 Cal.Rptr.3d 912] (AFG), AFG was in the business of buying installment sales contracts from used car dealers and making loans to the car buyers. As a condition of the loan, the buyer had to protect AFG's lien on the car, either by obtaining insurance for physical damage to or theft of the car, or by participating in AFG's loss damage waiver program wherein the buyer had to report to AFG whenever the car sustained damage of more than $500. AFG used licensed insurance adjusters to determine whether the car was repairable. The court concluded that "[w]e

do not believe that the LDW represents the principal object of AFG's transation. . . . [¶] Neither the terms nor the conditions of the LDW suggest an insurance policy." (114 Cal.App.4th at p. 855.)

I find Staples's contentions to be persuasive that insurance was merely peripheral to the main object of shipping packages in this instance and the trial court was correct in refusing to instruct the jury on the California Insurance Code and regulations.

If I were in the majority, I would affirm the decision of the trial court in its entirety.

Respondent's petition for review by the Supreme Court was denied March 15, 2006, S141078. George, C. J., did not participate therein.