Filed 4/13/15  Meyeraan v. Valley of CA CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| ROSS P. MEYERAAN,<br><br>        Plaintiff and Appellant,<br><br>v.<br><br>VALLEY OF CALIFORNIA, INC.,<br><br>        Defendant and Respondent. | A136989<br><br>(City & County of San Francisco<br> Super. Ct. No. CGC08478905) |

Plaintiff and appellant Ross P. Meyeraan, a licensed real estate sales associate, appeals from a judgment dismissing his third amended complaint against defendant Valley of California, Inc., doing business as Coldwell Banker (Coldwell Banker), a licensed real estate brokerage firm.  He seeks to reinstate the second cause of action[1] alleging that during his affiliation with Coldwell Banker, the broker was engaged in the selling of insurance by requiring him, as part of his independent contractor agreement, to pay a business fee for a legal assistance program.  Because Coldwell Banker was neither licensed nor authorized to issue or sell insurance, it was allegedly violating the Insurance Code, and, consequently, committing an act of unfair competition and an unlawful business act or practice within the meaning of section 17200 of the Business & Professions Code.  Based on our independent review of the record, we conclude that, as a matter of law, Coldwell Banker was not selling insurance and therefore it was not in

---

[1]     Although plaintiff's third amended complaint alleged four causes of action, the court granted his motion to dismiss the first, third, and fourth causes of action without prejudice, and they are not at issue on this appeal.

1

violation of the Insurance Code, or, consequently, the provisions of section 17200 of the Business & Professions Code. Accordingly, we affirm the judgment.

**FACTUAL AND PROCEDURAL BACKGROUND[2]**

From 2002 to 2005, plaintiff was affiliated with Coldwell Banker under an independent contractor agreement (ICA) governing their relationship. When he was first hired, plaintiff was required to sign both an ICA and an appendix to the ICA, titled, "Legal Assistance Program Effective January 1, 2002" (LAP). During the ensuing years, plaintiff did not sign another ICA, but he signed various LAP agreements on January 31, 2003 (effective January 1, 2003), January 13, 2004 (effective January 1, 2004), and December 30, 2004 (effective January 1, 2005). [3]

In the third amended complaint (the operative pleading), plaintiff's causes of action were premised on the claim that the LAP is an insurance agreement between Coldwell Banker, as the insurer or insurance agent or both, and plaintiff, as the insured, and a business fee represented an insurance premium. In the second cause of action, it was alleged that Coldwell Banker's practice of requiring a fee for its LAP violated Insurance Code section 700[4] because it was engaging in the business of insurance without the requisite license from the Department of Insurance, and consequently, was committing an unlawful business act or practice within the meaning of Business and Professions Code section 17200. In its answer, defendant countered that the ICA, including the LAP, did not constitute insurance for purposes of compliance with the provisions of the Insurance Code.

---

[2]     We set forth only those facts as are necessary to resolve this appeal.

[3]     While the format and some of the language in the LAP changed over the years (from "legal assistance program" and payment of an "administrative fee" to "legal service program and business fee") the substantive provisions of the LAP essentially remained the same throughout plaintiff's affiliation with Coldwell Banker.

[4]     Insurance Code section 700 forbids any person or entity from transacting any class of insurance business without securing a certificate of authority from the Insurance Commissioner.

2

After discovery Coldwell Banker moved for summary judgment seeking, in pertinent part, dismissal of the second cause of action, which was opposed by plaintiff. Following consideration of the parties' papers, oral argument, and plaintiff's withdrawal of the first, third, and fourth causes of action, the trial court dismissed the second cause of action and granted Coldwell Banker's motion for summary judgment dismissing the entire action. In so ruling, the court found that "on the record presented as a matter of law, the LAP set forth in the appendix to the ICA was not insurance." A judgment was issued in favor of Coldwell Banker and against plaintiff dismissing the third amended complaint. Plaintiff's timely appeal ensued.

## DISCUSSION

"The rules of review [of summary judgment rulings] are well established. If no triable issue as to any material fact exists, the defendant is entitled to judgment as a matter of law. [Citations.] In ruling on the motion, the court must view the evidence in the light most favorable to the opposing party. [Citation.] We review the record and the determination of the trial court de novo." (*Shin v. Ahn* (2007) 42 Cal.4th 482, 499.)

In challenging the trial court's ruling, plaintiff contends "not only that the LAP is an unlawful insurance program but that genuine issues of material fact exist that precluded" the grant of summary judgment in favor of Coldwell Banker. As now discussed, we conclude the trial court correctly ruled, as a matter of law, that Coldwell Banker was not selling insurance for the purpose of requiring it to comply with statutory and regulatory insurance law.

In analyzing the issue before us, we consider the entire ICA and not just the provisions governing the LAP. (Civ. Code, § 1641 ["[t]he whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other"].) Here, there is no contention that the terms of either the ICA or the LAP are ambiguous. Thus, Coldwell Banker "had no burden to produce extrinsic evidence to establish what was plainly and expressly written in the agreement." (*Reilly v. Inquest Technology, Inc.* (2013) 218 Cal.App.4th 536, 557.)

3

The ICA obligated the named sales associate "to use his . . . best efforts to list and sell residential real estate for the mutual benefit of COLDWELL BANKER, ASSOCIATE, and the general public." In return, Coldwell Banker agreed, from time to time, to designate the branch sales office with which the named associate would be affiliated, to make available to the named associate all of Coldwell Banker's current listings, and such names of prospective purchasers as Coldwell Banker in its discretion deemed appropriate. The ICA also included a paragraph regarding the sales associate's compensation to be paid in accordance with the terms and provisions of an attached Schedule A, requiring the sharing of commissions between the named sales associate and Coldwell Banker. The ICA's Paragraph 5, entitled, "Liability," described the parties' rights and obligations regarding the sales associate's expenses, his use of any assistant, and his responsibility to obtain insurance for any automobile used in the course of his affiliation with Coldwell Banker. Additionally, Paragraph 5 described the parties' rights and obligations regarding claims and litigation arising in the course of the sales associate's affiliation with Coldwell Banker: "(D) COLDWELL BANKER shall have the exclusive right to determine whether to commence litigation to collect a commission or for any other purpose and to settle any litigation or other dispute of any type. Expenses for attorney's fees and related costs incurred by COLDWELL BANKER in the collection of the commission shall be shared by the ASSOCIATE on the same basis, and in the same proportion as net commissions are divided in Schedule A. To the extent feasible, COLDWELL BANKER will consult with ASSOCIATE in advance of initiating any such collection. ASSOCIATE shall promptly reimburse COLDWELL BANKER for ASSOCIATE'S share of those fees and costs as they are incurred by COLDWELL BANKER. [¶] (E) COLDWELL BANKER and ASSOCIATE shall comply with the terms of the Legal Assistance Program which is attached hereto as Appendix 1 and made a part hereof." Appendix 1 further "describe[d] the respective rights and duties of the parties when there is a claim, lawsuit or legal proceeding involving ASSOCIATE and/or

VALLEY OF CALIFORNIA, INC., DBA COLDWELL BANKER (hereinafter 'COLDWELL BANKER')." [5]

In seeking reversal of the trial court's ruling, plaintiff argues the LAP is an illegal contract of insurance for the following reasons: (1) the LAP allows for a substantial transfer and distribution of risk of loss among similarly situated individuals; (2) the LAP is the type of indemnity program that insurance regulations were designed to address; and (3) the LAP is more than an incidental part of the relationship between plaintiff and Coldwell Banker. We conclude plaintiff's arguments are unavailing.

As to plaintiff's contentions regarding the LAP's shifting and distribution of risk of loss and the nature of the relationship between the parties, we conclude that our Supreme Court's decision in *Title Ins. Co. v. State Bd. of Equalization* (1992) 4 Cal.4th 715 (*Title Ins. Co.*) is dispositive. In that case, the court stated: " '[T]he mere fact that a contract contains these two elements [shifting and distribution of risk of loss] does not necessarily mean that the agreement constitutes an insurance contract for purposes of statutory regulation.' (*Truta v. Avis Rent A Car System, Inc.* (1987) 193 Cal.App.3d 802, 812 [238 Cal.Rptr. 806] [*Truta*] [[6]].) Rather than simply look to whether the contract involves an assumption of a risk, we will instead ask ' "whether that [assumption of risk] or something else to which it is related in the particular plan is its principal object and purpose." ' (*Transportation Guar. Co. v. Jellins* (1946) 29 Cal.2d 242, 249 [174 P.2d 625] [*Jellins*]; see also 12 Appleman, Insurance Law and Practice (1981) § 7002, p. 14.) [¶] Following this reasoning, California courts have held that arrangements similar to those in this case were not illegal contracts of insurance. For instance, a car rental agreement containing an element of insurance was not an illegal contract of insurance because the insurance element was peripheral to the main purpose of the contract. (*Truta,*

---

[5] In the trial court plaintiff alleged that "[w]hile 2005 is the last year that [he] entered into the LAP, on information and belief, the program has continued in substantially the same form from 2005 to present." For convenience, we have set forth the LAP provisions effective January 1, 2005 in Appendix A of this opinion.

[6] *Truta* was overruled by statute on another ground as stated in *Schnall v. Hertz Corp.* (2000) 78 Cal.App.4th 1144, 1155, fn. 5.)

*supra*, 193 Cal.App.3d at p. 814.) Likewise, a truck maintenance contract in which the contractor agreed to insure the vehicles for the owner with an authorized insurance company was held to be not an illegal contract because the main purpose of the contract was to supply labor. (*Jellins, supra*, 29 Cal.2d at pp. 249, 252-253.) Further, a medical services corporation that provided medical services to low-income patients who paid monthly membership dues did not engage in the business of insurance illegally, because the principal purpose or object of the operation was service rather than indemnity. (*California Physicians' Service v. Garrison* (1946) 28 Cal.2d 790, 809-810 [172 P.2d 4, 167 A.L.R. 306].)" (*Title Ins. Co., supra*, at p. 726.) [7] Applying the aforecited case law, we conclude that the ICA is not an illegal contract of insurance. The main function of the ICA is to require both sales associates and Coldwell Banker to carry out mutual obligations in securing sales of real estate, not the provision of insurance to its sales associates. The defense and indemnification provisions in the LAP "are secondary to the main object and purpose of the" ICA. (*Title Ins. Co., supra,* at pp. 726-727.)

We also see no merit to plaintiff's contention that the LAP is the type of indemnity program that the insurance regulations were designed to address. The LAP differs "from a traditional insurance contract in several key respects . . . . (*Allen v. Burnet Realty LLC* (Minn. 2011) 801 N.W.2d 153, 159 (*Allen*).) First, "there was no underwriting of risk unique" to individual sales associates as all were charged a fixed business fee. (*Ibid*.) Second, Coldwell Banker "was not assuming new risk in exchange for" payment of a premium in the nature of the business fee because as a broker it was legally responsible for the actions of its sales associates whether they are independent contractors or employees. (*Allen, supra,* at p. 156; see *California Real Estate Loans, Inc. v. Wallace* (1993) 18 Cal.App.4th 1575, 1581 [a "broker is liable as a matter of law for all damages caused to third persons by the tortious acts of the salesperson committed within the

---

[7] Appellant asks us not to consider *Jellins* and *Title Ins. Co*. because the agreements in those cases are either not remotely similar or the converse of the LAP in this case. However, we cite and rely on those cases for their statements of the principle of law applicable to this case, not the terms of the agreements at issue in those cases or the ultimate resolution of those appeals.

course and scope of employment"]; Bus. & Prof. Code § 10032, subd. (a) ["all other obligations of brokers and real estate salespersons to members of the public shall apply regardless of whether the real estate salesperson and the broker to whom he or she is licensed have characterized their relationship as one of 'independent contractor' or of 'employer and employee' "].)  Instead, the LAP is an agreement that delineates the parties' responsibilities for certain claims arising from their mutual contractual obligations, not a contract of insurance.  (See *Allen, supra*, at p. 159 ["the [LAP] appears to be merely a method of ensuring that [the parties] are defending any disputes as a team, rather than as separate entities"].) [8]

Relying on *Automotive Funding Group, Inc. v. Garamendi* (2003) 114 Cal.App.4th 846, 855-856, plaintiff argues that triable issues of material fact exist as to whether the LAP is insurance given Coldwell Banker's characterization of the LAP, "the mandatory nature" of the LAP, and the business fee was inflated, designed to generate a profit, and conferred a benefit on Coldwell Banker.  However, by his argument plaintiff incorrectly asks us to look at the LAP as a separate agreement, instead of as a part of the ICA.  As stated above, we look at the ICA in its entirety, together with the LAP, and in doing so, we fail to see how any of the above noted factors, either singly or collectively, transform the principal object and purpose of the ICA from an agreement between the parties to secure sales of real estate to an agreement for insurance.

In sum, we conclude, as a matter of law, that the ICA, including the LAP, was not insurance and therefore Coldwell Banker was not required to comply with the provisions

---

[8]      In arguing that the LAP is a contract of insurance, plaintiff asks us to consider *Sentry Select Ins. Co. v. Fidelity & Guaranty Ins*. Co. (2009) 46 Cal.4th 204; *Sweatman v. Department of Veterans Affairs* (2001) 25 Cal.4th 62; *Wayne v. Staples, Inc*. (2006) 135 Cal.App.4th 466; *Grand Rent A Car Corp. v. 20th Century Ins. Co.* (1994) 25 Cal.App.4th 1242; and *Cal.-Western Ins. Co. v. St. Bd. of Equal.* (1957) 151 Cal.App.2d 559.  "No good purpose would be served by an extensive review of cases dealing with multitudinous types of organization and function holding them to be or not to be engaged in some form of insurance business." (*Jordan v. Group Health Ass'n.* (D.C. Cir. 1939) 107 F.2d 239, 247, fn. omitted.)  We deem it sufficient to note that the cases cited by plaintiff are factually distinguishable from the facts in this case, and in all events, do not support plaintiff's arguments.

7

of the Insurance Code and the regulations of the Department of Insurance. Because plaintiff has not stated a cause of action under section 17200 of the Business & Professions Code, we uphold the dismissal of the second cause of action. Accordingly, the judgment in favor of Coldwell Banker is affirmed. **[9]**

## DISPOSITION

The judgment is affirmed. Defendant is awarded costs on appeal.

/ / /

/ / /

/ / /

---

[9] In light of our resolution of this appeal, we do not need to address the parties' other contentions.

Coldwell Banker filed a request for judicial notice of an unpublished opinion filed by Division Three of the Fourth District Court of Appeal in *Griffith v. Coldwell Banker Residential Brokerage Co.* (June 3, 2013, G047506), which request is opposed by plaintiff. We deny the request for judicial notice as our rules of court prevent us from considering this unpublished opinion. (Cal. Rules of Court, rule 8.1115(a) ["an opinion of a California Court of Appeal . . . that is not certified for publication or ordered published must not be cited or relied on by a court or a party in any other action"].)

**APPENDIX A**
**APPENDIX [TO] INDEPENDENT CONTRACTOR AGREEMENT**
**LEGAL SERVICE PROGRAM AND BUSINESS FEE**
**EFFECTIVE JANUARY 1, 2005**
For the San Francisco Offices and Half Moon Bay

1.  INTRODUCTION. This Appendix describes the respective rights and duties of the parties where there is a claim, lawsuit, or legal proceeding involving ASSOCIATE and/or VALLEY OF CALIFORNIA, INC, DBA COLDWELL BANKER (hereinafter "COLDWELL BANKER"). This Appendix supersedes all prior comparable agreements.

2.  DEFINITION OF "COVERED CLAIM"; BENEFITS TO ASSOCIATE. A "covered claim" means a claim made against COLDWELL BANKER or ASSOCIATE, or both, for monetary damages, mediation, arbitration, or any civil proceedings seeking damages or rescission against COLDWELL BANKER and/or ASSOCIATE, arising out of ASSOCIATE'S alleged acts or omissions within the scope and authority of the [ICA] between ASSOCIATE and COLDWELL BANKER and which are not excluded or accepted herein. COLDWELL BANKER will indemnify and hold ASSOCIATE harmless for any sums above the amount of the ASSOCIATE'S "contribution" for "covered claims". ASSOCIATE and COLDWELL BANKER will jointly be represented by Legal Counsel approved by COLDWELL BANKER at no cost to ASSOCIATE for all "covered claims." Payment of the Business Fee shall not be construed as a guarantee of a legal defense in all matters and a defense will only be provided for "covered claims".

3.  ASSOCIATE "CONTRIBUTION" AND POTENTIAL WAIVER. ASSOCIATE'S "contribution" for "covered claims" is limited to a maximum of $2,500 for each claim. The ASSOCIATE'S "contribution" will be waived in its entirety if the COLDWELL BANKER office file contains all of the following:
    (a)  A seller disclosure form signed by the seller and provided to the buyer and acknowledged by the buyer prior to closing except where the disclosure form is not applicable or not required by statute;
    (b)  A home warranty policy was purchased prior to or at closing where legally permissible or a written waiver signed by the buyer is received or, where a site-specific property disclosure report was obtained;

9

(c)    A statement recommending a property inspection be obtained is provided to the buyer prior to closing, or a copy of an inspection report that was obtained; and

(d)    Any and all COLDWELL BANKER approved standard sales contracts or a sales contract drafted by a licensed attorney.

4.    <u>EXCLUSIONS</u>.  These matters deemed to be excluded from the definition of "covered claims" are:

(a)    any intentional, fraudulent, dishonest, criminal or malicious acts or omissions including concealment or intentional misrepresentation;

(b)    unfair competition, piracy, theft of any real or personal property, the wrongful taking of concepts or other intellectual property and/or commingling of funds;

(c)    property damage directly caused by ASSOCIATE;

(d)    bodily injury directly caused by ASSOCIATE;

(e)    unlawful discrimination, humiliation, harassment or misconduct of protected classes as defined by the federal and/or state fair housing laws;

(f)    commission claims;

(g)    environmental cleanup claims;

(h)    any claim made by an insured under an insurance policy against any other insured under the same policy;

(i)    any claim concerning the ASSOCIATE'S activities as a principal in the transaction or where ASSOCIATE has a financial interest in the property that is the subject of the claim;

(j)    any punitive or exemplary damages awarded as part of a judgment or arbitration;

(k)    any claims for sexual harassment or hostile work environment;

(l)    any fine, sanctions or penalties including, but not limited to, State and Federal RESPA laws, do not contact laws, and Association of Realtors ® disciplinary proceedings;

(m)    any loss that results from the valuation of a business independent of any property that is sold;

(n)    the failure to purchase or maintain any insurance or bonds; or

(o)    ASSOCIATE'S failure to cooperate in the defense of the claim.

5.    <u>COOPERATION</u>.  When a claim arises, ASSOCIATE shall cooperate with COLDWELL BANKER and its Legal Counsel and shall assist in the investigation and defense.  ASSOCIATE shall immediately (within 24 hours) notify COLDWELL BANKER of each claim and shall immediately (within 24 hours) provide COLDWELL BANKER with all demand letters, legal papers and other documents, which might relate to that matter and/or any other documents requested by Legal Counsel for COLDWELL BANKER.  ASSOCIATE shall not make any payments, meet with any other party's lawyer, make any admissions,

statements or claims, settle any claims, assume any obligation or incur any expenses without the prior written consent of COLDWELL BANKER. COLDWELL BANKER retains the right to settle any and all claims, in its sole discretion.

6. EXCEPTIONS:
   (a) In the event that ASSOCIATE is investigated by and/or needs to be defended before a state licensing board, peer review committee or governmental regulatory body as a result of a notice or a proceeding, which arises out of an act, error, or omission otherwise covered by this Appendix, then the COLDWELL BANKER LEGAL ASSISTANCE PROGRAM shall be limited to the payment up to $5,000 for attorney's or consultants fees actually incurred.
   (b) If, after there is a joint defense of COLDWELL BANKER and ASSOCIATE, an actual conflict arises in representation, and continued joint representation is not in the interests of COLDWELL BANKER or ASSOCIATE, the joint representation will be terminated and Legal Counsel for COLDWELL BANKER will withdrew from representing ASSOCIATE, and ASSOCIATE will be advised to seek separate counsel, the cost of which will not be paid for by COLDWELL BANKER. In the event that a conflict is declared, ASSOCIATE agrees that Legal Counsel for COLDWELL BANKER may continue to represent COLDWELL BANKER. ASSOCIATE always has the right to select and be represented by independent legal counsel at ASSOCIATE'S sole expense.

7. INDEMNIFICATION. ASSOCIATE shall indemnify and hold COLDWELL BANKER harmless from all losses or damages, including attorney fees and costs, which COLDWELL BANKER incurs or becomes liable for resulting from any excluded claim or for breach of the [ICA] and/or this Appendix by ASSOCIATE.

8. DURATION. Unless discontinued or modified by COLDWELL BANKER, the provisions of this Appendix shall survive the termination of the [ICA]. COLDWELL BANKER reserves the right to discontinue or modify the LEGAL ASSISTANCE PROGRAM at any time.

9. PRE-PAYMENT AT TERMINATION. If ASSOCIATE'S association terminates for any reason before COLDWELL BANKER receives notice of a claim or before the claim is concluded, COLDWELL BANKER may, in its sole discretion, require ASSOCIATE to pay COLDWELL BANKER within 30 days after demand by COLDWELL BANKER the maximum amount of ASSOCIATE'S contribution, as specified above, subject to adjustment by COLDWELL BANKER if, when the claim is later concluded, ASSOCIATE'S actual share is less than the maximum paid.

10.      <u>BUSINESS FEE</u>.  The Business Fee is due and payable on January 1st of each year.  If the ASSOCIATE is disassociated during the year, the full business fee will be collected either by check, credit card, or from the ASSOCIATE'S remaining escrows.

    If the fee is paid before January 31st of the next year, it is discounted to $2,470.00.  If the fee is paid after January 31st, it is $2,600.00.  Payable either in a lump sum or $850.00 on the first four closed escrows (if no escrows are closed, $1,300.00 for the first two quarters to keep current in the payment schedule).  Complete payment is due by June 30th.

    In the first year that ASSOCIATE joins COLDWELL BANKER the business fee is $850.00 on the first four closed escrows, up to a maximum of $2,600.00.

    Notwithstanding the method chosen for paying this Business Fee, this fee is not prorated or refundable.

_____
Jenkins, J.

We concur:

_____
Pollak, Acting P. J.

_____
Siggins, J.

*Ross P. Meyeraan v. Valley of California, Inc.*, A136989

12