Filed 4/23/18

# IN THE SUPREME COURT OF CALIFORNIA

SAMUEL HECKART,

        Plaintiff and Appellant,

        v.

A-1 SELF STORAGE, INC., et al.,

        Defendants and Respondents.

S232322

Ct.App. 4/1 D066831

San Diego County
Super. Ct. No. 37-2013-00042315-CU-BT-CTL

In its rental agreements with tenants, defendant A-1 Self Storage, Inc. (A-1) states that it shall not be liable for loss of or damage to a tenant's stored property, and it requires the tenant to obtain insurance for such losses. A-1 also offers an alternative to the requirement that a tenant obtain insurance: in exchange for an additional $10 in rent each month, A-1 will reassume the risk of such losses, up to $2,500. Plaintiff Samuel Heckart contends this alternative constitutes a contract of insurance, and because A-1 is not licensed to sell insurance, its sale of this indemnity agreement violates the Insurance Code.

We conclude that A-1's alternative indemnity agreement is not subject to regulation under the Insurance Code. First, the code's provisions that regulate the sale of insurance by self-service storage facilities as agents for licensed insurers (Ins. Code, § 1758.7 et seq.; hereinafter Article 16.3; all further statutory references are to this code unless otherwise noted) have no application to A-1's alternative arrangement because A-1 is not acting as an agent for an insurer. Second, the code's definition of insurance (§ 22) has long been understood not to

1

reach indemnification agreements between parties to a transaction if the indemnification agreement is incidental to the principal object and purpose of the parties' transaction, and it does not appear that the Legislature intended through its enactment of Article 16.3 to prohibit such incidental indemnification agreements. Here, the indemnification agreement is incidental to the principal object and purpose of renting storage space, placing it outside the scope of insurance regulation. Therefore, we will affirm the judgment of the Court of Appeal.

## I. FACTS

"In reviewing a judgment of dismissal after a demurrer is sustained without leave to amend, we must assume the truth of all facts properly pleaded by the plaintiffs, as well as those that are judicially noticeable." (*Howard Jarvis Taxpayers Assn. v. City of La Habra* (2001) 25 Cal.4th 809, 814.) Therefore, we take the facts from the first amended complaint and matters subject to judicial notice.

Defendant A-1 owns the self-storage facility where plaintiff rented a storage unit. Neither A-1 nor any of the defendants that have an ownership interest in A-1 or assist in its management are licensed to sell insurance in California.[1] Defendant Deans & Homer is an insurance underwriter, agent, and broker licensed to sell insurance in California.

Plaintiff rented a storage unit from A-1 in June 2012 for $55 a month. The "A-1 Self Storage Rental Agreement" (Rental Agreement) signed by plaintiff released the owner of the storage facility from liability for loss of or damage to property at the facility. The Rental Agreement also required the tenant to maintain insurance for the value of the tenant's stored property. Finally, it stated that if the

---

[1] These additional defendants are Caster Properties, Inc., Caster Family Enterprises, Inc., and Caster Group, L.P.

2

tenant "elects to participate in the Customer Goods Protection Plan" (Protection Plan), the provisions of the Rental Agreement related to A-1's liability would be modified by the Protection Plan.

The Protection Plan acknowledges the provisions of the Rental Agreement that limit the operator's liability and require the tenant to obtain insurance, and then provides: "In consideration of an additional payment of $10.00 monthly rent, the Owner retains liability for loss of or damage to Tenant's property, while stored within the enclosed storage unit . . . , up to $2,500 for losses caused by the following: [¶] a. Fire, explosion or smoke. [¶] b. Theft, vandalism or malicious mischief . . . . [¶] c. Roof leak or water damage. [¶] . . . [¶] d. Windstorm that first causes damage to the building. [¶] e. Collapse of the building where your property is stored." The Protection Plan allows a tenant to decline to participate in the Plan, but in that event, it requires the tenant to provide to the owner, within 30 days, information concerning the tenant's own insurance policy. If such information is not provided within 30 days, the tenant will be automatically enrolled in the Protection Plan until such insurance information is provided.

Plaintiff marked on the Protection Plan that he declined to participate, but thereafter he was automatically enrolled in the plan and was charged $10 a month, presumably for failure to provide evidence of his own insurance within 30 days of signing the contract.

In April 2013, plaintiff brought this putative class action on behalf of himself and all others similarly situated, claiming the Protection Plan violates the Unfair Competition Law (Bus. & Prof. Code, § 17200 et seq; UCL) and the Consumers Legal Remedies Act (Civ. Code, § 1750 et seq.; CLRA). He also alleged theories of misrepresentation and civil conspiracy. His claims are based on the allegation that the Protection Plan is a policy of insurance, which A-1 is not licensed to sell.

The operative first amended complaint alleges that Deans & Homer created the Protection Plan, and told A-1 that if A-1 sold the Protection Plan instead of licensed insurance, A-1 "could charge higher rates than approved by the California [Department of Insurance], and avoid the additional administrative costs required if A-1 sold a licensed insurance product." In addition, A-1 "would net nearly twice the revenue from the . . . Protection Plan [as] opposed to the sale of insurance." To accomplish this end, Deans & Homer provided A-1 with the language for the Protection Plan and related forms. Deans & Homer also provided policies and procedures related to implementation of the Protection Plan. A-1 consults with Deans & Homer and obtains its approval "before changing any aspect of the Protection Plan . . . ."

The first amended complaint further alleges that to cover losses incurred by A-1 under the Protection Plan, Deans & Homer sold A-1 a "Storage Operator's Contract Liability Policy" under which Deans & Homer assumed the liability for all losses under the Protection Plan in excess of $250,000 per year. Thus, A-1 assumed the risk of the first 100 claims per year for losses of $2,500. At any given time, more than 15,000 renters are enrolled in the A-1 Protection Plan. Under the Storage Operator's Contract Liability Policy, Deans & Homer retains the "right to adjust the [Protection Plan] claim directly with the [Protection Plan] customer." The policy requires A-1 to provide monthly reports to Deans & Homer setting forth who is enrolled in the Protection Plan and their coverage dates.

According to the first amended complaint, employees at A-1 facilities are instructed to offer the Protection Plan to each rental customer. They are to tell customers that A-1 does not insure their property, and that the Protection Plan satisfies the insurance requirement of the Rental Agreement. If the customer has insurance, the employee is to "remind them that under [A-1's] plan there is no

4

deductible and since it's not insurance no issues with rate increases etc. [will arise] down the road if there were to be a claim."

Plaintiff alleges that "[t]he A-1 Defendants do not treat their Protection Plan as a part of the Rental Agreement. Defendants operate the Protection Plan, and account for its revenues and costs as an insurance program within A-1 Defendants' self-storage business and computer system." The first amended complaint compares the terms of the Protection Plan to the terms of a storage insurance policy offered by Deans & Homer, and asserts that "[t]he Protection Plan functions exactly like an insurance policy. The only difference is that the Protection Plan offers less coverage and costs more than Deans & Homer's licensed and registered Customer Storage Insurance Policy and other self-storage insurance policies available in the marketplace."[2]

The complaint concludes that the Protection Plan is an insurance policy, and alleges that defendants fail to comply with insurance regulations. For example, A-1 allegedly does not provide an appeals process with respect to claims, does not maintain the payments thereunder in segregated accounts, and does not maintain reserves adequate to pay claims, as is required with respect to insurance.

---

[2]    The Protection Plan costs $10 per month, and provides $2,500 in coverage with no deductible. Deans & Homer's policy costs $9.66 per month for $3,000 in coverage, but has a $100 deductible. In addition to covering the same risks as covered by the Protection Plan, the Deans & Homer policy covers damage caused by "Labor Strikes, Riots or Civil Commotion," "Landslide, Earthquake or Volcanic Eruption," "Vehicles," "Falling Objects, but only if the building where your property is stored is first damaged by the Falling Object," Weight of Ice, Snow or Sleet," "Sinkhole Collapse," and "Aircraft, Missiles or Spacecraft." Also, unlike the Protection Plan, the Deans and Homer policy does not exclude the following: "Stolen goods or contraband," "Firearms of any type," "Fine rugs (over $500 in value)," and "Antiques and collectibles." Otherwise, the extensive list of covered items and exclusions appears to be comparable.

5

According to plaintiff, "[d]efendants characterize their illegal insurance plan as a 'Customer Goods Protection Plan,' for the sole purpose of collecting insurance premiums while avoiding the requirements of the California Insurance Code." He asserts that A-1 misleads consumers by requiring insurance on stored property, and by failing to disclose that the Protection Plan is unlicensed and illegal insurance, that A-1 does not segregate the payments or maintain reserves, that cheaper and more comprehensive insurance is available in the marketplace, that renters are not required to purchase the Protection Plan to rent a storage unit, and that a renter's home or renter's insurance policy might provide coverage for stored property. He alleges that by 2013, A-1 was annually collecting approximately $1.8 million under the Protection Plan, paying Deans & Homer approximately $133,000, and paying approximately $25,000 in claims.

The trial court sustained defendants' demurrer to the first amended complaint based on its conclusion that the Protection Plan is not insurance, and entered judgment for defendants. The Court of Appeal affirmed the judgment. Both lower courts premised their rulings on the "principal object and purpose" test, which excludes from insurance regulation transactions that have an element of insurance, where that element is merely incidental to a different principal object and purpose. The lower courts concluded that the Protection Plan was incidental to the principal object and purpose of the parties' transaction, the rental of storage space.

## II. DISCUSSION

Plaintiff contends that A-1's sale of the Protection Plan violates the Insurance Code because A-1 is not licensed to sell insurance. For the reasons set forth below, we conclude that the challenged transaction does not involve the sale of insurance.

6

## A. Article 16.3

We begin our analysis with Article 16.3 of the Insurance Code, which is entitled "Self-Service Storage Agents." (§§ 1758.7-1758.792.) " ' "As in any case involving statutory interpretation, our fundamental task here is to determine the Legislature's intent so as to effectuate the law's purpose." [Citation.] "We begin with the plain language of the statute, affording the words of the provision their ordinary and usual meaning and viewing them in their statutory context, because the language employed in the Legislature's enactment generally is the most reliable indicator of legislative intent." [Citations.] The plain meaning controls if there is no ambiguity in the statutory language. [Citation.] If, however, "the statutory language may reasonably be given more than one interpretation, ' " 'courts may consider various extrinsic aids, including the purpose of the statute, the evils to be remedied, the legislative history, public policy, and the statutory scheme encompassing the statute.' " ' " [Citation.]' [Citation.]" (*Fluor Corp. v. Superior Court* (2015) 61 Cal.4th 1175, 1198.)

Article 16.3 provides that "[a] self-service storage facility . . . shall not offer or sell insurance unless it has complied with the requirements of this article and has been issued a license by the commissioner as provided in this article." (§ 1758.7, subd. (a); see § 12900 et seq. [regarding insurance commissioner].) The referenced license allows a self-storage facility to "act as a[n] . . . *agent for an authorized insurer* only with respect to the following types of insurance and only in connection with, and incidental to, self-service storage rental agreements: [¶] (a) Insurance that provides hazard insurance coverage to renters for the loss of, or damage to, tangible personal property in storage or in transit during the rental period. [¶] (b) Any other coverage the commissioner may approve as meaningful and appropriate in connection with the rental of storage space." (§ 1758.75, italics added.) An application for such a license must include "[a] certificate by the

7

insurer that is to be named in the self-service storage agent license stating that the insurer has satisfied itself that the named applicant is trustworthy and competent *to act as its agent* for the limited purpose of offering or selling the types of insurance specified in Section 1758.75 in connection with, and incidental to, self-service storage rental agreements and that *the insurer will appoint the applicant to act as its agent* in reference to offering or selling those types of insurance if the applicant is licensed by the commissioner." (§ 1758.71, subd. (a)(2).)

These provisions reflect that Article 16.3 addresses the licensing of self-storage facilities to act as agents to sell insurance on behalf of licensed insurers. The same focus is reflected in the rest of the Article, which imposes various requirements and restrictions in connection with a storage facility's actions as an insurance sales agent. (See §§ 1758.72 [training requirements for agent's employees], 1758.73 [employee's conduct shall be deemed conduct of the agent], 1758.74 [penalties for licensee's violations or for acting as an agent without a license], 1758.76 [agent must provide specified information and disclosures], 1758.77 [the insurer represented by the licensee may relieve licensee from requirement that funds be segregated], 1758.78 [prohibited activities of an agent], 1758.78 [insurer that provides insurance through an agent shall file a copy of the policy with the commissioner].)

The allegations of the operative complaint reflect that A-1 is not acting as an agent of an insurance company. Although Deans & Homer has assisted A-1 with the Protection Plan, Deans & Homer does not provide insurance *to renters*; rather, the Protection Plan is an agreement between only A-1 and individual renters. Therefore, the procedures and regulations that apply to a self-service storage facility in its role as an insurance agent do not apply to the challenged transaction.

8

**B. The principal object and purpose test**

As noted above, Article 16.3 provides that self-storage facilities cannot sell "insurance" unless licensed as an agent for a licensed insurer. (§ 1758.7, subd. (a).) The Insurance Code defines "insurance" as "a contract whereby one undertakes to indemnify another against loss, damage, or liability arising from a contingent or unknown event." (§ 22.) Courts have interpreted section 22 "as requiring two elements: '(1) a risk of loss to which one party is subject and a shifting of that risk to another party; and (2) distribution of risk among similarly situated persons. [Citations.]' " (*Title Ins. Co. v. State Bd. of Equalization* (1992) 4 Cal.4th 715, 725-726 (*Title Ins. Co*).) The Protection Plan meets these criteria: A-1 shifts the risk of losses up to $2,500 from a renter to A-1, and distributes that risk among all renters who purchase the Plan.

As the courts below recognized, however, not every contract that meets these criteria is an insurance contract for purposes of regulation by the Insurance Code. "State regulation [of insurance] generally extends to the 'business of insurance'; to the extent a particular contract or transaction is not the business of insurance, it is outside the scope of state regulation of the insurance industry." (1 New Appleman on Insurance Law (Library ed. rev. 2017) § 1.03[1], p. 1-19.) Therefore, we have long recognized that "a sound jurisprudence does not suggest the extension, by judicial construction, of the insurance laws to govern every contract involving an assumption of risk or indemnification of loss . . . ." (*Transportation Guar. Co. v. Jellins* (1946) 29 Cal.2d 242, 248 (*Jellins*).) " 'That an incidental element of risk distribution or assumption may be present should not outweigh all other factors. If attention is focused only on that feature, the line between insurance or indemnity and other types of legal arrangement and economic function becomes faint, if not extinct. . . .' " (*Id*. at p. 249.)

9

To determine whether a contract is subject to insurance regulation, we consider "whether, looking at the plan of operation as a whole, 'service' rather than 'indemnity' is its principal object and purpose." (*California Physicians' Service v. Garrison* (1946) 28 Cal.2d 790, 809 (*California Physicians' Service*).) "[E]ach contract must be tested by its own terms as they are written, as they are understood by the parties, and as they are applied under the particular circumstances involved." (*Jellins, supra*, 29 Cal.2d 242 at p. 248.)

We have applied the principal object and purpose test in a variety of circumstances, and determined that the agreements at issue were incidental to a different principal object and purpose. For example, in *Title Ins. Co., supra*, 4 Cal.4th 715, a title company would conduct a title search and prepare a report concerning the conditions under which title insurance would be issued. The title company would then issue a title insurance policy, as an agent for an insurance company. Pursuant to the underwriting agreement, the title company retained most of the insurance premium, and paid the remainder to the insurance company in exchange for its acceptance of the risk of insuring the title. Finally, although the title company was not a party to the insurance policy, the title company was obligated by its underwriting agreement with the insurance company to pay a portion of certain title insurance claims. The Board of Equalization contended that the title company's payment of claims was taxable income to the insurer; otherwise, the Board argued, the allocation of risks between the title insurer and the title company constituted the illegal provision of insurance by the title company.

We concluded that assumption of risk by the title company was not the principal object and purpose of the underwriting agreements. "Their main function is not to require the underwritten title company to provide insurance, either to the title insurer or to the insured, but instead to require the underwritten

10

title company to perform a title search and examination carefully and diligently as well as to carry out the formalities involved in the issuance of a title insurance policy. The indemnification provisions are secondary to the main object and purpose of the underwriting agreements. In fact, the agreements to indemnify appear to be designed, at least in part, to give the underwritten title companies an incentive to perform their title search in a nonnegligent manner, as the title companies are in the best position to eliminate possible risk. Therefore, the title company is not involved in the illegal practice of insurance even if an underwritten title company is deemed to have provided indemnification in connection with the main purpose of its contract with the title insurer." (*Title Ins. Co., supra*, 4 Cal.4th at pp. 726-727.)

In the course of addressing the principal object and purpose of the underwriting agreement in *Title Ins. Co.*, we noted other cases in which risk-shifting was only a secondary purpose of a contract, including *Truta v. Avis Rent A Car System, Inc*. (1987) 193 Cal.App.3d 802 (*Truta*). In *Truta*, the plaintiff challenged a rental car company's "collision damage waiver" (CDW) option as a sale of insurance by a company not licensed to sell insurance. The rental car agreement stated that the renter was liable for up to $1,000 in damage to the car regardless of who was at fault, but if the renter chose the CDW option for an additional fee of $6 per day, the renter would not be liable for any damage to the car. The court concluded that "[t]he principal object and purpose of the transaction before us, the element which gives the transaction its distinctive character, is the rental of an automobile. Peripheral to that primary object is an option, available to the lessee for additional consideration, to reallocate the risk of loss (up to the sum of $1,000) to the lessor in the event the vehicle sustains damage during the rental term. Thus, . . . after reviewing the entire contract we are satisfied that this tangential risk allocation provision should not have the effect

11

of converting the defendants as contracting lessors into insurers subject to statutory regulation." (*Id*. at p. 814.)

In contrast, in *Sweatman v. Department of Veterans Affairs* (2001) 25 Cal.4th 62 (*Sweatman*), we concluded that an indemnity agreement was not merely incidental to a different object and purpose. In *Sweatman*, a veteran had purchased a home through the Cal-Vet program pursuant to a contract that required the buyer to make installment payments to the Department of Veterans Affairs. That program also required the buyer to purchase the Cal-Vet home protection plan, through which the Department provided coverage for loss of life and disability. The Department contended that the protection plan was incidental to the Cal-Vet loan contract, the principal object and purpose of which was to finance the home purchase.

We noted that the Cal-Vet protection plan met the criteria for "insurance," and it appeared to be "disability insurance" as that term was defined in the Insurance Code. We also observed that the Department referred to the indemnification agreement as "insurance." Finally, we distinguished the indemnity agreement from the circumstances in *Truta, supra*, 193 Cal.App.3d 802. "The coverage in *Truta* was optional and clearly peripheral to the contract for rental of an automobile." (*Sweatman, supra*, 25 Cal.4th at p. 73.) We also noted that unlike the CDW, which required only the checking of a box on the rental agreement, "the [Cal-Vet] home protection plan is distinct from the loan contract; it involves a separate application process and approval, including medical disclosures, subject to investigation and review. Nor does the Cal-Vet home protection plan involve a merely 'tangential risk allocation' as in *Truta*; it is, instead, a spreading of risk within insurance concepts." (*Id*. at pp. 73-74.)

Plaintiff correctly notes that in a number of cases, including *Title Ins. Co., supra*, 25 Cal.4th 62, and *Truta*, *supra*, 193 Cal.App.3d 802, the transactions at

12

issue were not subject to insurance regulation for reasons other than the fact that they were incidental to a different object and purpose.**3**  For example, in *California Physicians' Service, supra*, 28 Cal.2d 790, a corporation formed by physicians to provide medical care and to spread the cost of the care over the organizations who enrolled their members or employees in the care plan did not assume any risk.  (*Id*. at p. 804.)  Therefore, the plan did not satisfy the definition of insurance.  We also noted the impelling need to provide adequate medical care to those with little income, and concluded that the Legislature intended to exempt such organizations from insurance regulation.  (*Id*. at pp. 809-810.)  As we recognized in *Jellins*, however, the central focus of our analysis in *California Physicians' Service* was the principal object and purpose of the contract (*Jellins, supra*, 29 Cal.2d at p. 249), which we characterized in *California Physicians' Service* as a "more compelling reason for holding that the [corporation] is not engaged in the insurance business."  (*California Physicians' Service, supra*, 28 Cal.2d at p. 809; see also *Title Ins. Co., supra*, 4 Cal.4th at p. 726 [summarized *California Physicians' Service* as holding that the corporation "did not engage in the business of insurance illegally, because the principal purpose or object of the operation was service rather than indemnity"].)

---

**3**      See *Title Ins., supra*, 4 Cal.4th at pp. 725-726, 810 (underwriting agreement did not distribute the risk among similarly situated title insurers, and statute limiting regulation of such organizations reflected legislative intent for exemption from insurance regulation; also, assumption of the risk was not the principal object and purpose of the agreement); *Automotive Funding Group, Inc. v. Garamendi* (2003) 114 Cal.App.4th 846, 857 (lender's agreement to retain its own risk of loss if borrower damaged the vehicle in which the lender had a security interest was not insurance because no risk was shifted; also, the loss damage waiver was not the principal object of the financing transaction); *Truta, supra*, 193 Cal.App.3d at p. 815 (applied principal object and purpose analysis, and also gave deference to view of the Dept. of Ins. that a CDW is a release of liability, not insurance).

13

Therefore, we will apply the principal object and purpose test to evaluate whether the Protection Plan is incidental to a different principal object and purpose of the parties' transaction. As explained below, various factors lead us to conclude both that the rental of storage space was the principal object and purpose of the parties' transaction, and the Protection Plan was incidental to that purpose. (See *Jellins, supra*, 29 Cal.2d 242 at p. 248 ["each contract must be tested by its own terms"].)

First, the Protection Plan adjusts risks between the parties to the Rental Agreement; A-1, not a third party, indemnifies the renter. Although a third party's agreement to provide indemnity with respect to risks arising from a transaction might be viewed as incidental to the transaction, a third party's indemnity agreement is not incidental to a different object or purpose *of the third party indemnitor*. As the court explained in *Wayne v. Staples, Inc.* (2006) 135 Cal.App.4th 466 (*Wayne*), "[a]n incidental contract provision that, for a fee, shifts risk of loss *from the consumer to the provider of the goods or services* does not make the agreement an insurance contract subject to regulation under the Insurance Code." (*Id*. at p. 476, italics added.) But "while it is true not all contracts allocating risk are insurance contracts subject to statutory regulation, *all insurance contracts*, even if sold as a secondary or incidental facet of a transaction with another, primary commercial purpose, are regulated by the Insurance Code and the Department of Insurance unless they fall within a specific regulatory exemption." (*Id*. at pp. 476-477, italics added.)[4]

---

[4]  In *Wayne*, a retailer that shipped orders to customers offered insurance coverage from an insurance company in the event of damage to the shipped goods. The retailer asserted that its sale of a third party's insurance was not subject to insurance regulation because the principal object and purpose of the transaction was to ship packages. (*Wayne, supra*, 135 Cal.App.4th at p. 473.) In addition to

*(Footnote continued on next page.)*

14

Second, A-1 assumes risks that arise directly from the rental relationship, and it does not provide indemnification beyond damages that might occur to property while it is stored in the rented space. Therefore, the Protection Plan has no purpose independent of the Rental Agreement, and is purely incidental to the Rental Agreement. In contrast, the coverage for loss of life or disability at issue in *Sweatman, supra*, 25 Cal.4th 62, was a type of indemnification that a person might purchase regardless of whether he or she was purchasing a home, because the risk of death or disability existed independent of the purchase of property.

Third, not only is the Protection Plan dependent on the Rental Agreement, the Protection Plan is optional. Although A-1 requires renters to arrange for indemnification with respect to property stored in its facilities, it does not require that the coverage be obtained from A-1. The fact that storage space may be rented without purchasing the Protection Plan tends to establish that the rental of space

---

*(Footnote continued from previous page.)*

explaining that insurance contracts from third parties are not incidental to the insured's separate transaction within the meaning of the principal object and purpose test, the court stated that "[u]se of the principal-object-and-purpose test to exempt a contract of inland marine insurance from statutory regulation is particularly inappropriate because this class of coverage, expressly regulated by the Insurance Code (see Ins. Code, §§ 100, subd. (3), 103), is intended to protect against loss or damage to goods in transit or while being prepared for or awaiting shipment. As a result, this insurance coverage will most often be offered, as it was in this case, in connection with, and incidental to, the customer's primary purpose of shipping his or her goods. Indeed, this distinctive aspect of inland marine insurance has been recognized in section 1635 of the Insurance Code, which exempts shippers . . . from insurance licensing requirements if they complete or deliver a certificate of coverage under an inland marine insurance contract to their customers without being paid or receiving a commission . . . ." (*Wayne, supra*, 135 Cal.App.4th at p. 477.) In contrast to the facts in *Wayne*, the Protection Plan's indemnification agreement does not fall within any class of coverage in the Insurance Code (see *post*, fn. 6), and is not regulated by Article 16.3.

15

rather than indemnification is the principal purpose of the parties' transaction. (See *Sweatman, supra*, 25 Cal.4th 62, 73 [citing the fact that the disability coverage was not optional in support of the conclusion that the coverage was not merely incidental to a different principal object and purpose].)

Fourth, the Protection Plan extends only to risks over which A-1 has some control, such as fires, roof leaks, criminal activity, and damage to the building. A-1 can reduce these risks by taking steps to prevent fires or the spread of fires, to increase security, and to strengthen the building. Therefore, the Protection Plan serves an additional purpose of providing an incentive to minimize the risks to stored property. (See *Title Ins. Co., supra*, 4 Cal.4th at p. 727 [title company's agreement to indemnify title insurer for a portion of title insurance claims gave the title company an incentive to perform title searches in a nonnegligent manner].) By addressing risks that are inherent in the transaction, and by placing the risks on the party best able to mitigate them, the parties may accomplish more than indemnification, as these contractual provisions might improve the service for which the parties are contracting and might forestall litigation concerning liability for damages. These additional functions of the Protection Plan further reduce the significance of the element of insurance.

Fifth, the $10 monthly charge for the Protection Plan is significantly less than the $55 monthly charge for renting space. This contrast tends to establish that the principal purpose of the transaction is the rental of storage space. (Cf. *People ex rel. Roddis v. California Mut. Assn.* (1968) 68 Cal.2d 677 [some members of a health care association received reimbursement for medical services rather than direct medical services; "where indemnity is a significant financial proportion of the business, the organization must be classified as an 'insurer' for the purposes of the Knox-Mills Plan Act"].) Plaintiff's allegation that A-1 can charge higher rates and net nearly twice the revenue by providing indemnification

16

with the Protection Plan rather than with insurance policies does not demonstrate that indemnification is more than incidental to the Rental Agreement. A more apt comparison would be the profitability of the Protection Plan and the profitability of the rental of storage space.

Plaintiff's allegation that defendants treat the Protection Plan and the Rental Agreement as separate contracts and maintain separate accounts for the payments related to each does not support a contrary conclusion. How A-1 chooses to track the funds does not affect whether the rental aspect is the principal object and purpose or whether the indemnification is incidental to that purpose. Nor does the allegation that A-1 obtains its own insurance with respect to some of the risk it has assumed tend to establish that the Protection Plan is insurance. The contract between Deans & Homer is independent of the Protection Plan and the Rental Agreement, and does not affect what constitutes the principal object and purpose of plaintiff's transaction with A-1.

Plaintiff contends we should also consider whether the business involves evils with which insurance regulation is concerned.[5] He notes our statement in *California Physicians' Service* that insurance regulations related to reserves and financial operations "become important only if the insurer has assumed definite obligations." (*California Physicians' Service, supra*, 28 Cal.2d at p. 810.) The assumption of an obligation — an agreement to indemnify another — is a basic element of insurance (§ 22); absent an obligation, no aspect of the transaction

---

[5] He focuses in part on the *Truta* court's quotation of an insurance treatise that identified such evils as a relevant consideration: " 'To what extent, in each case, did the specific transactions or the general line of business at issue involve one or more of the evils at which the regulatory statutes were aimed?' " (*Truta, supra*, 193 Cal.App.3d at p. 812.) *Truta*'s analysis, however, focused only on the principal object and purpose of the transaction. (*Id.* at pp. 813-814.)

17

constitutes insurance, and the principal object and purpose test need not be applied. If the indemnification obligations assumed are great in relation to what is claimed to be the principal object and purpose, that circumstance might demonstrate that indemnification is the more significant aspect of the transaction, but this conclusion follows from the principal object and purpose analysis, not from the fact that insurance regulation is concerned with the financial affairs of insurers.

More generally, the contention that the principal object and purpose test should consider whether insurance regulation is warranted to address the evils with which the insurance laws are concerned is an argument for courts to extend insurance regulation by judicial construction. The principal object and purpose test is a means to delineate between the business of insurance, which the Legislature has regulated under the Insurance Code, and transactions that include only an incidental element of insurance. The Legislature is free to extend insurance regulation beyond the historical limits recognized by the principal object and purpose test, but that is a policy decision for the Legislature to make. As discussed below, the legislative history of Article 16.3 does not reflect an intent to subject to insurance regulation contracts that are outside the reach of insurance regulation based on the principal object and purpose test.

### C. Effect of Article 16.3 on the principal object and purpose test

Plaintiff contends that Article 16.3's specific and narrow concern with the sale of hazard insurance by a self-storage facility to renters for loss of or damage to stored property "in connection with, and incidental to, self-service storage rental agreements" (§ 1758.75) reflects an intent to apply insurance regulation to any indemnification contracts that are incidental to self-storage rental agreements. He asserts it would be absurd to interpret the statutory scheme to treat such contracts

18

as insurance if the risk is assumed by a third party insurer, but not if a facility undertakes an indemnification obligation. In his view, a contract cannot constitute insurance when one person is the insurer and not constitute insurance when another person is the insurer, and he asserts that applying the principal object and purpose test in this circumstance puts form over substance. He concludes that where the Insurance Code "expressly prohibits a specific type of company from selling a specific type of contract without regulation, it most certainly prohibits such a company from *selling and performing* that contract without regulation."

Because the principal object and purpose test applies where a transfer of risk satisfies the elements of insurance, an insurance policy from a third party may be an alternative to an indemnification agreement between the parties. However, there is no principle that precludes parties to a transaction from choosing to adjust risks and provide for indemnification between themselves despite the fact that insurance is available from a third party. Moreover, if the availability of insurance precluded parties to a transaction from adjusting risks between themselves without subjecting their agreement to insurance regulation, insurers could foreclose application of the principal object and purpose test simply by obtaining the approval of the Department of Insurance to market a particular type of insurance policy. Finally, the two alternatives are not the same; as explained above, the adjustment of risk between parties to a transaction may provide an incentive to mitigate the risks and may forestall litigation. For these reasons, whether indemnification with respect to a particular risk constitutes "insurance" may vary depending on whether the indemnitor is a third party insurer or a party to the transaction that gives rise to the risk.[6]

---

[6] This conclusion also resolves plaintiff's contention that indemnification incidental to a self-storage rental agreement should be regulated as insurance

*(Footnote continued on next page.)*

Although the risk-shifting arrangement in this case is not "insurance" under our well-established precedents, we acknowledge that the very narrow focus of Article 16.3 might suggest that the Legislature had a particular concern with risk-shifting arrangements related to hazards to property in self-storage facilities. As plaintiff notes, none of the cases that have applied the principal object and purpose test have involved provisions of the Insurance Code that focus on such a narrow type of risk. Therefore, we will consider additional indicia of legislative intent. (See *Fluor Corp. v. Superior Court, supra*, 61 Cal.4th at p. 1198 [if statutory language may reasonably be given more than one interpretation, courts may consider extrinsic aids]; *Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 61 [even absent ambiguity in statutory language, "we may observe that available legislative history buttresses our conclusion"].)

We first consider Article 16.3 in the wider context of the Insurance Code. The Legislature has authorized licenses that allow insurance agents to sell broad categories of coverage. (See, e.g., §§ 31 ["insurance agent" may sell on behalf of an insurer all classes of insurance except life, disability, or health insurance], 32 ["life licensee" may sell on behalf of an insurer life, accident, and health insurance].) The Legislature has also authorized licenses related to narrow categories of risk. "Travel insurance agents" (§ 1752 et seq.) may sell "insurance

_____

*(Footnote continued from previous page.)*

because it comes within one of the Insurance Code's 21 classes of insurance. (§ 100.) According to plaintiff, such indemnification comes within the class entitled "miscellaneous insurance," which includes "any *insurance* not included in any of the foregoing classes, and which is a proper subject of insurance." (§ 120, italics added.) His argument presupposes that the risk-shifting in the Protection Plan is "insurance" within the meaning of sections 22 and 120 and Article 16.3, which he has not established.

coverage for personal risks incidental to planned travel," such as trip disruptions, loss of baggage, and illness or death while traveling. (§ 1753, subd. (c)(1).) A vendor of portable electronics may obtain a license to sell insurance "in connection with, and incidental to, the sale of portable electronics or the sale or provision of accessories or services related to the use of portable electronics." (§ 1758.61.) A rental car company may obtain a license to act as an agent on behalf of an authorized insurer to sell insurance coverage for risks related to the use of a rental car, "in connection with and incidental to rental agreements." (§§ 1758.8, subd. (b); see § 1758.85.) Such provisions appear simply to make readily available an alternative to other sources of indemnification, such as product warranties,[7] or automobile insurance coverage the renter might otherwise purchase. Therefore, we do not infer from the narrow focus of Article 16.3 that the Legislature intended to prohibit indemnification agreements other than insurance from licensed insurers.

Next we consider the legislative history of Article 16.3, and find that it is consistent with the conclusion that Article 16.3 is concerned only with authorizing and regulating storage facilities' sales of insurance policies on behalf of insurance companies. Article 16.3 was enacted in 2004 through Assembly Bill 2520.[8] (Stats. 2004, ch. 248, § 3, pp. 3720-3725.) Its sponsors were identified as The Bob Bader Company and Public Storage, Inc. (Assem. Com. on Insurance, analysis of

---

[7] Product warranties involve the transfer and distribution of risk, but product warranties are typically incidental to the sale of the product, which is the principal object and purpose of the transaction. Therefore, "ordinary warranties do not constitute insurance." (1 New Appleman on Insurance Law, *supra*, § 1.03[3][b][iii][A], p. 1-23.)

[8] We take judicial notice of the legislative history of Assembly Bill 2520. (Evid. Code, § 452, subd. (c).)

21

Assem. Bill No. 2520 (2003-2004 Reg. Sess.) as amended Apr. 14, 2004, p. 4 (Assembly Analysis); Sen. Com. on Insurance, analysis of Assem. Bill No. 2520 (2003-2004 Reg. Sess.) as amended Apr. 24, 2004, p. 5 (Senate Analysis).) An analysis of the bill for the Assembly Committee on Insurance stated that according to sponsor Bob Bader Company, "self-storage facilities have been offering optional personal property coverage insurance to their tenants for more than twenty years for two reasons: [¶] 1) coverage helps tenants recover financially when there is a loss. A large number of self-storage tenants do not have personal property insurance. They are either in-transit (between homes) or rent an apartment and fail to insure their property; and, [¶] 2) the courts have relieved self-storage facilities of liability for loss or damage to a tenant's property when there is a loss, if the tenant had been advised that it is his or her responsibility to insure their property, and optional coverage had been offered by the self-storage facility." (Assembly Analysis, pp. 2-3; see also Senate Analysis, p. 4.)

The legislative history reflects that although the Department of Insurance had not received any consumer complaints regarding the storage facilities' activities, the Department's view was that "self-service storage facilities selling insurance on behalf of agents and/or insurers should be also licensed" (Assembly Analysis, *supra*, p. 3), and the Department had "issued cease and desist orders against several self-service storage facilities. This bill is the industry's response to the [Department's] position. [¶] . . . According to the sponsors, this bill is modeled on the law governing the sale of insurance by rental car companies and their agents, with a few modifications." (Senate Analysis, *supra*, p. 4; see § 1758.81 et seq. [provisions governing sale of insurance by rental car companies].)

There was no opposition to the bill (Assembly Analysis, *supra*, p. 4; Senate Analysis, *supra*, p. 4; Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading

analysis of Assem. Bill No. 2520, as amended July 22, 2004, pp. 4-5), but the Department of Insurance commented on the legislation. According to an analysis for the Senate Committee on Insurance, the Department "stated that a limited agent license for self-service storage facilities should not have to meet all of the requirements currently imposed on the car rental industry." (Senate Analysis, *supra*, p. 4.) The Department also proposed "additional administrative safeguards" such as requiring that a licensee be at least 18 years of age, requiring the submission of training materials with the application for a license, and requiring a licensee to pay the costs of an enforcement action or investigation. (*Id.* at p. 4.)

This history reflects that the purpose of the statute was to enable self-storage facilities to act as insurance agents for insurance companies with respect to a narrow category of insurance related to hazards to stored property. There is no express reference in the legislation or its history to risk-shifting between the parties to a storage contract. The legislation's reference to insurance "incidental to" the rental of storage space (§ 1758.7, subd. (b)), which is the same language used in the articulation of the principal object and purpose test, might suggest that the Legislature had that test in mind when it enacted the legislation. A stronger inference, however, is that the language was taken from the statutory provision on which it was modeled — Article 16.6 of the Insurance Code, which authorizes rental car companies to sell insurance coverage for risks related to the use of a rental car, "incidental to rental agreements." (§ 1758.8, subd. (b).) By the time Article 16.6 was enacted in 1999, *Truta, supra*, 193 Cal.App.3d 802, had applied the principal object and purpose test to car rental companies' use of CDWs, but Article 16.6 makes no mention of this doctrine or of precluding CDWs. In addition, Article 16.1 of the Insurance Code, which allows the sale of insurance "incidental to" the sale of portable electronics, assumes that product warranties, by

23

which manufacturers and sellers themselves provide indemnity incidental to the sale of their products, will remain available, as the article excludes from its reach "insurance covering a seller's or a manufacturer's obligations under a warranty." (§ 1758.69, subd. (e)(2)(B).) Therefore, it does not appear that the phrase "incidental to" in these various licensing schemes was intended to reference the principal object and purpose test, or to extend their reach to forms of indemnification that are not considered "insurance" under the Insurance Code.

In response to our invitation to address the issues presented, the Insurance Commissioner has urged us to conclude that the Legislature intended to regulate the transaction at issue in this case through its enactment of Article 16.3, and, in any event, the principal object and purpose doctrine does not exclude this case from regulation as insurance. He requests that we "give weight to his official, considered views of the law, as set forth in this brief, to the extent the Court finds those views reasonable and persuasive."

"An agency interpretation of the meaning and legal effect of a statute is entitled to consideration and respect by the courts; however, unlike quasi-legislative regulations adopted by an agency to which the Legislature has confided the power to 'make law,' and which, if authorized by the enabling legislation, bind this and other courts as firmly as statutes themselves, the binding power of an agency's *interpretation* of a statute or regulation is contextual: Its power to persuade is both circumstantial and dependent on the presence or absence of factors that support the merit of the interpretation." (See *Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 7.) We have noted "two broad categories of factors relevant to a court's assessment of the weight due an agency's interpretation: Those 'indicating that the agency has a comparative interpretive advantage over the courts,' and those 'indicating that the interpretation in question is probably correct.' " (*Id*. at p. 12.)

24

We have considered the Commissioner's views, but for the reasons set forth above, we disagree with his interpretation of Article 16.3 and the historical limitations on the reach of insurance regulation.[9]  As we have noted, the expansion of insurance regulation is a task for the Legislature.  Moreover, the Legislature has specifically regulated this industry (Bus. & Prof. Code, § 21700 et seq.), and has provided that the regulatory provisions "shall not be construed to impair or affect the right of the parties to create additional rights, duties, and obligations in and by virtue of the rental agreement . . . ."  (Bus. & Prof. Code, § 21713.)  If the Legislature perceives a need to regulate these agreements, it can weigh whether to treat them as insurance, which would extend numerous regulatory provisions to them and perhaps cause storage companies no longer to offer indemnity, or the Legislature might choose more limited regulation, such as limiting the companies' fees for indemnity and requiring reserves or insurance to satisfy renters' claims.  (See Bus. & Prof. Code, § 21701.1, subds. (a)(1), (4) [fee for transporting a storage container to a customer and back to a storage facility

---

[9]     We agree with the Commissioner, however, that the view expressed prior to this litigation by legal staff of the Department of Insurance in correspondence with Deans & Homer is entitled to little weight.  The Commissioner states that the letters from the Department's staff, which expressed the view that indemnification agreements like the Protection Plan are not subject to regulation as insurance, "are not the result of 'careful consideration by senior agency officials' but rather reflect an interpretation prepared 'in an advice letter by a single staff member. . . .' (*Yamaha Corp. of America v. State Bd. of Equalization*[, *supra*,] 19 Cal.4th 1, 13.)" The view expressed in the letters is not a quasi-legislative rule, promulgated pursuant to delegated lawmaking power.  In addition, it was not disseminated as an annotation by the Department to be considered by anyone other than the recipient, and there is no information regarding how carefully the issue was considered.  (See *Yamaha Corp. of America v. State Bd. of Equalization, supra*, 19 Cal.4th at pp. 11-16.)

shall not exceed $100; owner of facility must maintain insurance of $20,000 per shipment].)  These are policy issues for the Legislature to resolve.

In sum, the Protection Plan does not constitute insurance subject to regulation under the Insurance Code.  The Legislature's enactment of Article 16.3 enables self-storage facilities to act as agents for insurance companies with respect to the narrow category of insurance described in Article 16.3, but it does not prohibit the parties' indemnification agreement set forth in the Protection Plan.  Because plaintiff's claims are premised on his contention that the Protection Plan is subject to regulation under the Insurance Code, his claims fail.

## III.  DISPOSITION

The judgment of the Court of Appeal is affirmed.

**CANTIL-SAKAUYE, C. J.**

**WE CONCUR:**

**CHIN, J.**
**CORRIGAN, J.**
**LIU, J.**
**CUÉLLAR, J.**
**KRUGER, J.**
**SMITH, J.**\*

---

\*      Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice Pursuant to article VI, section 6 of the California Constitution.

26

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** Heckart v. A-1 Self Storage, Inc.

_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 243 Cal.App.4th 525
**Rehearing Granted**

_____

**Opinion No.** S232322
**Date Filed:** April 23, 2018

_____

**Court:** Superior
**County:** San Diego
**Judge:** John Meyer

_____

**Counsel:**

Finkelstein & Krinsk, Jeffrey R. Krinsk, William R. Restis, David J. Harris, Jr., and Trenton R. Kashima for Plaintiff and Appellant.

Dale E. Washington; Zakari Law, Raymond Zakari; Baker, Burton & Lundy and Brad N. Baker as Amici Curiae on behalf of Plaintiff and Appellant.

Sheppard Mullin Richter & Hampton and John T. Brooks for Defendants and Respondents A-1 Self Storage, Inc., Caster Group LP, Caster Properties, Inc., and Caster Family Enterprises, Inc.

Wilson, Elser, Moskowitz, Edelman & Dicker, John R. Clifford and David J. Aveni for Defendant and Respondent Deans & Homer.

Dentons US and Charles A. Bird for California Self Storage Association as Amicus Curiae on behalf Defendants and Respondents.

Xavier Becerra, Attorney General, Diane S. Shaw, Assistant Attorney General, and Molly K. Mosley, Deputy Attorney General, for State of California as Amicus Curiae, upon the request of the Supreme Court.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Trenton R. Kashima
Finkelstein & Krinsk
550 West C Street, Suite 1760
San Diego, CA  92101
(619) 238-1333

John T. Brooks
Sheppard Mullin Richter & Hampton
501 West Broadway, 19th Floor
San Diego, CA  92101
(619) 338-6500

John R. Clifford
Wilson, Elser, Moskowitz, Edelman & Dicker
410 West A Street, Suite 1900
San Diego, CA  92101
(619) 321-6200